IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2018 DEC 13  AM 10: 35

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____

SPEECH FIRST, INC.,

                                        Plaintiff,

v.

GREGORY L. FENVES, in his official capacity
as President of the University of Texas at
Austin; SONCIA REAGINS-LILLY, in her
official capacity as Vice President for Student
Affairs and Dean of Students; CHRIS
SEDORE, in his official capacity as Vice
President and Chief Information Officer;
LEONARD N. MOORE, in his official capacity
as Vice President for Diversity and Community
Engagement; MARQUITA BOOKER, in her
official capacity as Assistant Vice President for
Inclusion and Equity; CAM BEASLEY, in his
official capacity as Chief Information Security
Officer; MARILYN A. TYUS, in her official
capacity as Assistant Vice President for
University Housing and Dining; KIMBERLY
BURDINE, COURTNEY CHAVEZ, EDNA
DOMINGUEZ, LIZ ELSEN, ELISA RAMOS,
AUDREY SORRELLS, RYAN SUTTON,
BETTY JEANNE TAYLOR, TONY VO,
LESLIE BLAIR, STEPHANIE BULLICK,
BROOKE BULOW, GONZALO
GONZALEZ, MARGARET LUEVANO, all in
their official capacities as members of the
Campus Climate Response Team; JEFFERY D.
HILDEBRAND, PAUL L. FOSTER, ERNEST
ALISEDA, SARA MARTINEZ TUCKER,
DAVID J. BECK, R. STEVEN HICKS,
KEVIN P. ELTIFE, JANIECE LONGORIA,
JAMES C. "RAD" WEAVER, all in their
official capacities as members of the University
of Texas System Board of Regents; JAMES B.
MILLIKEN, in his official capacity as the
Chancellor of the University of Texas System.

                                        Defendants.

COMPLAINT

Civil Action No: A18CV1078LY

Plaintiff Speech First, Inc. brings this action under the First and Fourteenth Amendments to the United States Constitution against Defendants for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1.      "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). After all, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2.      Yet the University of Texas at Austin and its officials have created an elaborate investigatory and disciplinary apparatus to suppress, punish, and deter speech that other students deem "offensive," "biased," "uncivil," or "rude." Although this Court previously instructed the University that the First Amendment does "not apply with less force on [its] campus," *Justice for All v. Faulkner*, 2004 WL 3957872, at *4 (W.D. Tex. Mar. 3, 2004), the University is ignoring that admonition. In its quest to restrict disfavored speech, the University relies on two main types of policies.

3.      First, the University has crafted a series of speech codes with numerous vague and overbroad prohibitions on student speech. The University's ban on "verbal harassment" extends to "offensive" speech, including "insults, epithets, ridicule, [and] personal attacks" "based on the victim's … personal characteristics, or group membership, … ideology, political views, or political affiliation." The University's Acceptable Use Policy for its information technology resources (such as email and internet access) prohibits communications that are "uncivil," "rude," or "harassing." And the University's Residence Hall Manual—which regulates the thousands of students who live in University housing—proscribes yet another version of "harassment," which it defines as including "racism, sexism, heterosexism, cissexism, ageism, ableism, and any other force that seeks to suppress another

individual or group of individuals." All of these prohibitions are backed by the threat of investigation and formal or informal discipline, yet they encompass protected expression and provide no clear or objective guidance to students about how to comply.

4.      Second, the University supplements these prohibitions with a Campus Climate Response Team, a team of senior University administrators who investigate and respond to "campus climate incidents" and "bias incidents." The University expansively defines such incidents as any perceived discrimination on the basis of "race, color, religion, national origin, gender, gender identity or gender expression, age, disability, citizenship, veteran status, sexual orientation, ideology, political views, or political affiliation." As examples of such incidents, the University has listed speech (whether in the classroom, on social media, at a party, or at a student organization event) that someone perceives as "offensive," "insulting," "insensitive," or "derogatory." Students accused of engaging in "bias incidents" risk an investigation from University officials and sanctions ranging from "diversity training and education" to formal discipline. Yet the definition of "bias incident"—the trigger for these consequences—encompasses wide swaths of protected expression. The Campus Climate Response Team is anathema to the First Amendment and poses a grave risk of chilling the open and unfettered discourse that should be central to higher education.

## JURISDICTION AND VENUE

5.      This action arises under the First and Fourteenth Amendments to the U.S. Constitution and is brought via 42 U.S.C. §§ 1983 and 1988.

6.      The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7.      Venue is proper under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in the Western District of Texas.

## PARTIES

8.      Plaintiff Speech First, Inc., is a nationwide membership organization of students, alumni, and other concerned citizens. Speech First is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. In particular, Speech First seeks to protect the rights of students and others at colleges and universities through litigation and other lawful means. Speech First has members who attend the University.

9.      The University is a public university organized and existing under the laws of Texas.

10.      Defendant Gregory L. Fenves is the President of the University. Fenves is responsible for the enactment and enforcement of University policies, including the policies challenged here. Fenves is sued in his official capacity.

11.      Defendant Soncia Reagins-Lilly is the Vice President for Student Affairs and Dean of Students. She oversees the nine departments of the Division of Student Affairs, including the Office of the Dean of Students and University Housing and Dining. Lilly is responsible for student discipline, University residences and the enforcement of residence contracts, and the Campus Climate Response Team. Lilly is sued in her official capacity.

12.      Defendant Chris Sedore is the Vice President and Chief Information Officer. He is responsible for the University's campus IT policies, including the Acceptable Use Policy for University Students. Sedore is sued in his official capacity.

13.      Defendant Leonard N. Moore is the Vice President for Diversity and Community Engagement. He oversees the Division of Diversity and Community Engagement, including the Office for Inclusion and Equity and the Campus Climate Response Team. Moore is sued in his official capacity.

14.     Defendant Marquita Booker is the Assistant Vice President for Inclusion and Equity. She oversees the Office of Inclusion and Equity, which investigates and responds to complaints of harassment and discrimination. Booker is sued in her official capacity.

15.     Defendant Cam Beasley is the Chief Information Security Officer. He is responsible for "maintaining a safe computing environment in support of the University's teaching, learning, and research missions," including by reviewing, approving, and implementing the Acceptable Use Policy for University Students. Defendant Beasley is sued in his official capacity.

16.     Defendant Marilyn A. Tyus is the Assistant Vice President for University Housing and Dining. She is responsible for the University's on-campus residence halls, university apartments, and dining and retail venues. On information and belief, Tyus is the "executive director" referenced in chapter 5 of the Institutional Rules on Student Services and Activities. Tyus is sued in her official capacity.

17.     Defendants Kimberly Burdine, Courtney Chavez, Edna Dominguez, Liz Elsen, Elisa Ramos, Audrey Sorrells, Ryan Sutton, Betty Jeanne Taylor, Tony Vo, Leslie Blair, Stephanie Bullick, Brooke Bulow, Gonzalo Gonzalez, and Margaret Luevano are members of the Campus Climate Response Team. They are responsible for investigating and responding to bias and campus climate incidents. The Team Defendants are sued in their official capacities.

18.     Defendants Jeffery D. Hildebrand, Paul L. Foster, Ernest Aliseda, Sara Martinez Tucker, David J. Beck, R. Steven Hicks, Kevin P. Eltife, Janiece Longoria, and James C. "Rad" Weaver are the nine members of the Board of Regents, the governing body of the University of Texas System. The Regent Defendants are responsible for the adoption and authorization of policies that govern students at the University, including the policies challenged here. The Regent Defendants are sued in their official capacity.

19.     Defendant James B. Milliken is the Chancellor of the University of Texas System. He is the chief executive officer of the University of Texas System and is responsible for instituting the policies and procedures of the Board of Regents. Milliken is responsible for all aspects of the University of Texas System's operations, including oversight and implementation of the policies challenged here. Milliken is sued in his official capacity.

## FACTS

**I.      College Students Have Robust First Amendment Rights.**

20.     "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

21.     The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 476 (1960)).

22.     The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957). The First Amendment's

protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

23.     Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas— no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670. Indeed, "the point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

## II.     The University's Speech Codes Unconstitutionally Chill Speech.

24.     The Foundation for Individual Rights in Education (FIRE) gives the University a "red light" rating—FIRE's worst rating. A red-light rating means that the University "has at least one policy that both clearly and substantially restricts freedom of speech." The "threat to free speech at a red-light institution is obvious on the face of the policy and does not depend on how the policy is applied."

25.     The University deserves its red-light rating, as it maintains a number of policies that restrict student speech. These restrictions, which are backed by the threat of investigations and formal or informal University discipline, significantly chill free expression on campus.

### A.     The campus-wide prohibition on "verbal harassment"

26.     In August of even-numbered years, the University publishes the Undergraduate Catalog, which is "the document of authority for all students." The Undergraduate Catalog is a component of the 2018-2019 General Information Catalog.

27.     Appendix C of the Undergraduate Catalog contains the Institutional Rules on Student Services and Activities. Chapter 13 of the Institutional Rules governs "Speech, Expression, and Assembly."

28.     Under the category of "Prohibited Expression," the Institutional Rules prohibit "verbal harassment." Verbal harassment is defined as "hostile or offensive speech" that (A) "is not necessary to the expression of any" "political, religious, philosophical, ideological, or academic idea," (B) "is sufficiently severe, pervasive, or persistent to create an objectively hostile environment that interferes with or diminishes the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University," and (C) "personally describes or is personally directed to one or more specific individuals." "Verbal harassment," the rule continues, "may consist of threats, insults, epithets, ridicule, personal attacks, or … harassing sexual speech …. Verbal harassment is often based on the victim's appearance, personal characteristics, or group membership, including but not limited to race, color, religion, national origin, gender, age, disability, citizenship, veteran status, sexual orientation, gender identity or gender expression, ideology, political views, or political affiliation." Institutional Rules § 13-204.

29.     The verbal-harassment rule "applies to all speech on the campus." *Id.*

30.     A student who "engages in harassment" is subject to University discipline. *Id.* § 11-404(a)(11).

31.     The University's prohibition of verbal harassment is repeated in the Hate and Bias Incidents section of the Handbook of Operating Procedures (HOP), which "communicate[s] institutional rules for operation, organization, and programming of the university, including policy relating to students." The Handbook states that the University "unequivocally condemns and prohibits … harassment." It explains that "[t]he principles of free inquiry and expression … do not protect … harassment." It further notes that "[t]he University may take disciplinary action in response to … incidents that have a substantial connection to the interests of the University regardless of the location in which the incident(s) occur." HOP 9-1810.

32.     The University's prohibition of verbal harassment is repeated in the Nondiscrimination Policy. That policy states that supervisors, administrators, and University officials are required to "promptly report[] incidents of … harassment" to the Dean of Students. HOP 3-3020.

33.     The verbal-harassment rule covers a wide range of protected speech, including speech that is "offensive" or that involves "ridicule" or "personal attacks."

34.     The verbal-harassment rule does not define vague, subjective terms like "offensive."

35.     The rule's vagueness—and potential breadth—is amplified by its list of examples of supposedly harassing speech, including "insults, epithets, ridicule, [and] personal attacks" "based on the victim's … personal characteristics, or group membership, including but not limited to … ideology, political views, or political affiliation." Speech that is based on someone's "ideology, political views, or political affiliation" self-evidently encompasses protected expression.

36.     The verbal-harassment rule nominally provides an exception for speech that is "necessary" to the expression of an idea. But the rule provides no objective guidance about what this amorphous phrase means or how it will be applied.

**B.      The Acceptable Use Policy's prohibitions on "incivility," "rudeness," and "harassment"**

37.     The University maintains information resources, including computer devices, data, applications, and supporting networking infrastructure. According to the University, "these technologies are critical to the multifaceted mission of the university, a mission that includes teaching, research, and public service."

38.     The Office of the Chief Information Officer promulgates the University's campus IT policies, including the Acceptable Use Policy for University Students (AUP). The Acceptable Use Policy was last revised in June 2013.

39.     The Acceptable Use Policy applies to all uses of the University's information resources, including University email accounts provided to students.

40.     All University students must be aware of, and abide by, the Acceptable Use Policy. AUP § 2.

41.     If a student violates the Acceptable Use Policy, the potential punishments "include[], but [are] not limited to: [v]erbal warning, [r]evocation of access privileges, [d]isciplinary probation, [s]uspension from the university, [and] [c]riminal prosecution." AUP § 7.1.

42.     The Acceptable Use Policy includes a list of "Responsibilities" and a list of "Requirements."

43.     As one of the "Requirements," section 5.6 of the Acceptable Use Policy requires students to "[b]e civil. Do not send rude or harassing correspondence." Section 5.6 adds that "[i]f someone asks you to stop communicating with him or her, you should. If you fail to do so, the person can file a complaint and you can be disciplined."

44.     Section 5.6 prohibits a wide array of protected speech, including emails and other electronic communications that are "rude" or "uncivil."

45.     The Acceptable Use Policy does not define the vague, subjective terms "civil," "rude," or "harassing."

**C.     The Residence Hall Manual's prohibitions on "incivility" and "harassment"**

46.     Nearly one in five University students lives on campus in University-owned, -operated, or -affiliated housing.

47.     According to the University, "students who live on campus are more successful and enjoy a more rewarding college experience than those living off campus" because they "[m]ake better grades," "[m]ake friends quicker," "[m]anage their time better," and "have greater opportunities to broaden [their] interests and gain leadership experience."

48.     The University Housing and Dining office promulgates the manuals, rules, regulations, terms, and conditions that govern the conduct of students and guests in University residences, including the 2018-2019 Residence Hall Manual (Manual).

49.     The Manual's rules and regulations are a "binding part of [the] residence hall terms and conditions." Manual at ii. A student who violates them can be punished in several ways, including reprimands, probation, room changes, removal from University housing, exclusion from future University housing, and University discipline. Violations of the Manual may also lead to "educational sanctions … that are reasonably designed to positively impact the student's understanding of the rule under consideration and/or responsibility as a member of the residence hall community." *Id.* at 27. Examples of educational sanctions "include, but are not limited to, on-line educational modules, meetings with University staff members, educational/reflection papers, poster assignments, or presentations at hall meetings." *Id.*

50.     One rule in the Manual is titled "Incivility." It states: "Students are expected to behave in a civil manner that is respectful of their community and does not disrupt academic or residential activity. Uncivil behaviors and language that interfere with the privacy, health, welfare, individuality, or safety of other persons are not permitted." *Id.* at 18.

51.     The incivility rule prohibits a wide array of protected speech, including speech that is not "respectful of the[] community" and speech that "interfere[s]" with another person's "individuality."

52.     The incivility rule does not define the vague, subjective terms "respectful," "civil," or "uncivil," nor does it define what it means to "interfere" with another student's "individuality."

53.     Another rule in the Manual is titled "Harassment." It prohibits "harassment and intimidation," including "verbal abuse." "Harassment and intimidation" are defined as including

"racism, sexism, heterosexism, cissexism, ageism, ableism, and any other force that seeks to suppress another individual or group of individuals." *Id.*

54.     While the residential harassment rule notes that "harassment as defined in the Institutional Rules" is subject to "disciplinary action" by "the Dean of Students," it provides a separate disciplinary mechanism for "harassment" as defined in the Manual: "When acts of harassment or intimidation occur in the residence hall environment, the Residence Life staff, in conjunction with the Residence Hall Council, may lead a floor or hall meeting to discuss the incident and decide, as a community, appropriate steps that need to be taken to address the incident." *Id.*

55.     The residential harassment policy prohibits a wide array of protected speech, including anything that fits into the vague and subjective categories of "cissexism," "ableism," or "any other force that seeks to suppress another individual or group."

### III.    The University's Campus Climate Response Team Chills Speech.

56.     The University established the Campus Climate Response Team (CCRT) in the spring of 2011. The impetus for the CCRT was then-President Powers' concern that "the university's dispute resolution procedures" were not "sufficient to handle any outbreaks of hateful or violent speech in a coordinated, campus-wide manner."

57.     The CCRT reports to the Office of the Vice President for Diversity and Community Engagement and is jointly coordinated through the Division of Diversity and Community Engagement and the Division of Student Affairs. Its members include representatives from the Office of the Dean of Students and the UT Police Department.

58.     The CCRT was created to investigate and respond to so-called "bias incidents" or "campus climate incidents." The "core functions" of the CCRT include "[g]athering information and managing the specific [bias] incident"; "[s]upporting individuals involved, including both those targeted by the incident and those who initiated the incident"; "[p]roviding appropriate and effective

education"; "[i]dentifying and connecting with appropriate support services"; "[e]valuating the response process post incident"; and "[c]oordinating, when appropriate, activities with other campus-wide entities, especially those involved with crisis management." The CCRT also works with the University to develop policies and procedures that will "minimize campus climate incidents."

59.     Because "bias incidents … negatively affect [t]he … campus community," the CCRT enlists "all members of the campus community to … help[] … eliminate bias and hate on campus." "Through the work of the CCRT," the University hopes that "bias incidents [can be] swiftly addressed in order to foster a more welcoming and inclusive campus culture."

60.     The CCRT implores students and others to report "bias incidents" and "campus climate incidents" at the University "as soon as possible after their occurrence."

61.     The definitions of "bias incident" and "campus climate incident" are broad and vague. Under the heading "Campus Climate Incident," the University's Policy on Hate and Bias Incidents states, "The University strongly encourages individuals who believe they have been discriminated against or have experienced threatened or actual violence on the basis of their race, color, religion, national origin, gender, gender identity or gender expression, age, disability, citizenship, veteran status, sexual orientation, ideology, political views, or political affiliation to report such incidents as provided in this policy." HOP 9-1810.

62.     Examples of bias incidents, according to the University, include "a student organization hosting a party with a racist theme" and "somebody … creat[ing] a hostile or offensive classroom environment." Other examples featured by the University include "[i]nsulting and insensitive posts on social media or group chat apps pertaining to race, gender identity, or sexual orientation," "[d]erogatory comments made on a … course Facebook page," "[f]aculty commentary in the classroom perceived as derogatory and insensitive," "[h]ostile and insensitive treatment in interaction with a campus department/unit," "verbal[] harassment on and off campus," "[s]tudent

organizations participating in traditions perceived as insensitive or based on stereotypes," and "[i]nsulting or insensitive online posts pertaining to race, gender identity, or sexual orientation."

63.     Reports can be submitted to the CCRT in person, by phone, or on the internet through a web-based form called the Campus Climate Incident Online Report Form. Virtually all reports are made online through this web-based form.

64.     Reports can be submitted by anyone "impacted by the incident," "including but not limited to the victim(s), witness(es) or any third party who was informed of the event but was not present at the time of its occurrence."

65.     The online report form begins by stating, "The University of Texas at Austin is committed to addressing incidents that impact our campus climate, especially those that are bias-related. Your assistance in bringing these incidents to our attention will enhance our ability to systematically identify and respond to such events. Please use this form to report a bias incident to the Campus Climate Response Team."

66.     The online form has spaces for Name, Local Address, Phone Number, and Email Address. It asks, "What is your association with the incident?" and has checkboxes for Victim, Witness, Third Party, and Other. The online form also asks, "What is your affiliation with The University of Texas at Austin?" and has checkboxes for Student, Faculty, Staff, Alumnus, Parent, Visitor, and Other. The online form has a space for Date of Incident, which the reporter must fill out. It also asks for the Approximate Time of Incident. It then asks, "Did the incident occur on campus?" and has checkboxes for On Campus, Off Campus, and Online. The form has a space for Location(s) of Incident, which the reporter must fill out. The form has a space for the reporter to share any additional information about this incident," which the reporter must fill out. The space explains that "[e]xamples may include comments, conduct, gestures, markings, physical injuries, property damage, etc."

67.     The online form has additional questions and spaces "[i]f the incident is bias-related." It first asks the reporter, "[W]hat is the perceived motive for the bias?" and has checkboxes for Age, Citizenship, Disability, Race/Ethnicity, Gender, Gender Expression, Gender Identity, National Origin, Religion, Sexual Orientation, Veteran Status, Unsure/Do Not Know, and Other (Please Specify). The form then asks three questions and has spaces for the reporter's responses: "Have you reported the incident to another University of Texas at Austin office?", "What response did you receive from the office to which you initially reported the incident?", and "What type of response would you like to see as a result of reporting this incident?".

68.     Reports can be submitted anonymously, which allows individuals "to report an incident but not be involved in the response."

69.     But the CCRT "cannot guarantee confidentiality." Its website and online form state that "we have a legal obligation to respond institutionally to situations that may threaten the safety of The University of Texas at Austin community or that potentially violate the Institutional Rules on Student Services and Activities and/or university policy."

70.     The CCRT maintains an online list of the reports it receives. It groups and codes reported incidents and then sorts them by Incident Number, Incident Date, Report Date (# of reports), Incident Location, Incident Location, Incident Type, Bias Motive, and CCRT Action Taken.

71.     The CCRT provides "[h]elpful hints for responding to or reporting a campus climate incident," including: "**Pay close attention** to the date, time and location of the incident, providing the facts of the incident in as much detail as possible. **Describe** all comments, conduct, gestures, markings, physical injuries, property damage, etc. **Identify** alleged offender(s) by name and UT Austin affiliation, if known, or by physical appearance (e.g., age, height, weight, race/ethnicity, clothing, distinguishing characteristics, etc.), if unknown. **List** any possible witness(es) by name with contact

information, if known, or if unknown, please indicate whether there were any witnesses." (Emphases in original.)

72.     From September 1, 2017, through October 2, 2018, the CCRT received reports of more than one hundred independent "bias incidents." The number of reports was 94 in 2012-13, 670 in 2013-14, 104 in 2014-15, and 194 in 2015-16. The number of distinct bias incidents described in these reports was 82, 69, 75, and 104, respectively.

73.     The most frequently reported type of bias incident is usually "verbal harassment or slurs," representing up to 48% of all reports. More recently, "online harassment" was the most reported type of bias incident.

74.     Up to 37% of reports ask the University to take disciplinary action against the perpetrator of the bias incident, depending on the year. Nearly 20% demand an acknowledgement or apology from the perpetrator, depending on the year.

75.     When the CCRT receives a report, it "responds within two business days." It makes at least two attempts to contact the incident reporter by phone or email. "In practice, team members prefer contact by telephone."

76.     Lead members of the CCRT "determine whether the situation, as reported, falls within the parameters of a campus climate incident." "Lead team members also determine if there is a possible violation of the university's Institutional Rules on Student Services and Activities or policies outlined in the General Information Catalog."

77.     If the incident potentially violates the law or the University's rules, the CCRT "works in partnership with campus and community resources that address violations of university policies and criminal acts." For example, the CCRT has "coordinated with partners such as the Office of the Dean of Students, Office of Institutional Equity, and UT Police Department to explore available actions to address the reported incidents. These include investigating and resolving incidents according to the

UT Austin Institutional Rules on Student Services and Activities; initiating an informal nondiscrimination policy resolution process; [and] facilitating diversity education with student."

78.     "Examples of responses" that occurred "directly as a result of CCRT reports include": "[i]nvestigation and resolution of incidents classified as a criminal act (coordinated with UTPD) or university policy violation (coordinated with the Office of the Dean of Students and the Office of Institutional Equity)"; "[i]nitiation of an informal non-discrimination policy resolution process (through the Office of Institutional Equity)"; "[d]iversity training and education with a department's staff, student organization members, and students in a course"; and "[e]ducational conversations or meetings with those initiating an incident (particularly student organizations) regarding the intent and impact of their actions, how the incident aligns with the organization's goals or mission, etc."

79.     Separately, the CCRT can respond to a bias incident by convening a full "team meeting." After "[t]he team evaluates the incident," it can take several actions, including "[c]oordination of responses to the reported incident," "[m]ediation for impacted student(s), staff, and faculty," and "[s]upport and information to student(s), staff or faculty who initiated the incident." "Examples of responses coordinated by the CCRT include" "[e]ducational conversations/meetings with those initiating an incident regarding the intent and impact of their actions" and "[e]ducational conversations bringing together those who were targeted by an incident and those who initiated an incident."

80.     For planned events that receive 10 or more reports to the CCRT, "[s]taff affiliated with the CCRT and the Office of the Dean of Students m[e]et with student leaders involved with the event."

81.     The CCRT can also involve "representatives from other university offices and departments, as well as the Austin community, … in the process of resolving a particular incident."

82.     A 2017 report from FIRE found that bias-response teams lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." Bias Response Team Report 2017, at 28 (Feb. 2017), bit.ly/2P9iEaj. "While universities should certainly be listening to their students and offering resources to those who encounter meaningful difficulties in their life on campus, the posture taken by many Bias Response Teams is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Id.* at 5; *see also* Jeffrey Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), bit.ly/1SaAiDB (arguing that bias-response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints").

83.     Other universities have likewise discovered that bias-response teams chill student speech. The University of Northern Colorado, for example, shuttered its bias-response team in 2016, explaining that it had come "at the expense of free speech and academic freedom" and that its so-called "voluntary" processes "made people feel that we were telling them what they should and shouldn't say." The University of Iowa likewise scrapped its plans to create a bias response team, citing their "high failure rate" and their tendency to "become almost punitive."

## IV.    The University's Unconstitutional Policies Are Fostering A Campus Environment That Chills Protected Expression And Fails To Protect Students' First Amendment Rights.

84.     The University's policies are irreparably harming countless students who seek to express themselves and voice their opinions without fear of investigation or punishment. The University's policies are especially likely to chill or deter speech on controversial or politically charged topics, as well as humor, satire, and parody. The result is that all University students lose the opportunity to challenge, debate, and learn from the views and experiences of their classmates.

85.     Unsurprisingly, the University's policies have created a campus environment that is hostile to the free exchange of ideas and that chills protected expression. According to an October 2018 survey by College Pulse, more than 80% of students at the University agree that they are not free to say what they believe on campus because others might find it offensive.

86.     Several recent examples illustrate the campus environment that the University' policies have fostered.

87.     During the recent confirmation hearing of now-Justice Brett Kavanaugh, members of the Young Conservatives of Texas (YCT) set up a pro-Kavanaugh table and held up supportive signs. A large group of students surrounded the table for approximately two hours, hurling expletives and forcibly grabbing and destroying the signs. One YCT member had his "Make America Great Again" hat ripped off his head. The incident ended because campus police escorted the YCT members away to protect their safety. The YCT members were then "doxxed," meaning their personal information was published online (including their names, phone numbers, emails, and jobs). Upon information and belief, the University has taken no action in response to these attempts to shut down YCT's speech.

88.     For the last two years, the University has released a Costume and Theme Selection Guide—a "checklist" of more than thirty dos and don'ts for Halloween costumes and themed sorority and fraternity parties. The Guide instructs students to avoid "intentionally or unintentionally appropriat[ing] another culture or experience." "[B]eing born in Hawaii," the Guide explains, "doesn't make you native Hawaiian." The Guide instructs students to avoid, among other things, "generic store-bought costumes or decorations" (because they are not "authentic"), as well as party themes like "Fiesta," "Around the World," and even "western/country." While the Guide purports to be "voluntary," it warns students that if they "choose not to take these considerations seriously" then they should be "fully prepared to deal with the consequences."

89.     After the Supreme Court issued its second decision in *Fisher v. University of Texas at Austin*—a case challenging the University's race-based admissions policies—members of YCT organized an "affirmative action bake sale." To draw an analogy to the University's admissions policy, the bake sale charged different prices based on the customer's race and sex. More than 100 students swarmed the bake sale, and some destroyed YCT's signs and baked goods. The bake sale prompted nearly 200 complaints to the CCRT, and more than 800 students signed a petition asking the University to disband YCT. Members of the University's Student Government also drafted a resolution to disband YCT, claiming that the bake sale violated the University's verbal-harassment policy (the same policy being challenged here). The University's Vice President for Diversity and Community Engagement issued a statement denouncing the bake sale as "inflammatory and demeaning" and responsible for "creat[ing] an environment of exclusion and disrespect among our students, faculty and staff."

90.     In the spring of 2014, the UT Objectivism Society planned to host an on-campus debate between Yaron Brook of the Ayn Rand Institute and Hames Galbraith of the Texas Inequality Project. The title of the debate was "Inequality: Should We Care?". When the Objectivism Society applied for funds that are generally available for these kinds of events, the University's Events CoSponsorship Board denied its request. The Objectivism Society asked for an explanation, but the Board responded that it "is unable to disclose any information regarding the deliberation process." The University provided no explanation for its decision until it received a letter from FIRE raising the prospect of unconstitutional viewpoint discrimination.

91.     In the spring of 2018, the University announced a new program called "MasculinUT." The program sought to address the supposed problem of "restrictive masculinity," including the supposedly offensive notions that men should be "successful," be "active," and "tak[e] care of people." The MasculinUT program was housed in the University's Counseling and Mental Health

Center, which prompted criticisms that the University views masculinity as a mental disorder. This criticism caused the University to temporarily shelve the program, only to relaunch it in the fall of 2018. During that time, it was revealed that the University had disciplined a law student by making him watch "The Mask You Live In," a movie that addresses America's "narrow definition of masculinity." The University required the student to write a "reflection paper" about the movie, addressing how "gender role stereotypes/concepts ... have impacted your relationships with women," "your idea of 'healthy masculinity,'" and "what active steps you can take today to encourage healthy attitudes around masculinity."

92.     In the fall of 2013, YCT announced an event titled "Catch an Illegal Immigrant." Volunteers would walk around campus wearing a label that said "illegal immigrant," and students who "caught" one of the volunteers would win a gift card. Intentionally provocative and controversial, the event was meant to spark debates and conversations about immigration. Before the event, however, the University's Vice President for Diversity and Community Engagement issued a statement that said, "If the members of YCT carry out their plan for 'Catch an Illegal Immigrant,' they are *willfully ignoring the honor code.*" (Emphasis added.) Because students who violate the honor code face discipline, YCT's members worried that the University would retaliate against them and cancelled the event. Meanwhile, a student petition with more than 5,000 signatures asked the University to use the event as a basis to disband YCT. The petition argued that YCT's right to "free speech" was outweighed by the University's "obligation to ... make the University a safe environment to historically oppressed groups." The event also generated 572 reports to the CCRT, 92% of which requested disciplinary action against members of YCT. The CCRT met with YCT members regarding the event.

93.     Less than two months ago, in October 2018, an event featuring conservative commentator Charlie Kirk was disrupted with chants and expletives, and many of the signs advertising the event were vandalized or removed. In the wake of that event, the University has begun requiring

student groups to obtain advance approval from the administration before inviting speakers to campus.

94.     These recent events reinforce what the University's official policies already make clear—that certain viewpoints are not welcome on campus and will be met with retribution from the University and/or other students.

## V.     The University's Unconstitutional Policies Are Causing Concrete And Direct Injuries To Speech First's Members.

95.     Speech First's members who attend the University are incurring concrete injuries as a direct result of the University's unconstitutional policies and actions. These students have a credible fear that the expression of certain viewpoints will be treated as "offensive," "biased," "rude," "uncivil," or "harassing," thus subjecting them to investigation or discipline.

96.     One Speech First member ("Student A") is a freshman at the University. Student A lives in a University dormitory and uses the University's information resources.

97.     Student A enrolled in the University because she wanted to learn in an intellectually challenging environment in which students and faculty are free to engage in lively, fearless debate and deliberation.

98.     Student A has views that are unpopular and in the minority on campus. Student A considers herself a Tea Party conservative. She strongly supports Israel, believes in a race-blind society, supports President Trump, is pro-life, and supports the border wall.

99.     Student A disagrees with students who advocate for views opposing her own. In particular, Student A disagrees with students who advocate for open borders and the protection of illegal immigrants, who support the BDS movement to end support for Israel, and who do not support the President.

100.     Student A wants to engage in open and robust intellectual debate with her fellow students about these topics in her dormitory, on campus, online, and in the city of Austin.

101.    Because Student A believes in these topics, she wants to speak passionately and forcefully about these issues. Student A wants to point out the flaws in her fellow students' arguments and encourage her fellow students to change their minds about these topics or, at a minimum, to understand her point of view.

102.    The University's policies are nonetheless chilling Student A's speech and deterring her from speaking openly about issues that are important to her.

103.    Student A credibly fears that expression of her views may be considered "offensive," "biased," "rude," "uncivil," or "harassing," under the Institutional Rules, the Acceptable Use Policy, and the Residence Hall Manual, thus risking investigation and formal or informal punishment.

104.    Student A also fears that expression of her views could result in her being reported, investigated, and potentially punished by the CCRT for engaging in a "bias incident" or "campus climate incident."

105.    Because the University's policies are vague about exactly what they proscribe, the only ways for Student A to avoid these risks of investigation and/or sanctions are to refrain from expressing her sincerely held views; to articulate her views less forcefully; or to articulate her opinions only in the company of students who already share her views.

106.    Because of her credible fear that her speech will be deemed "biased," "rude," "uncivil," "harassing," or a "campus climate incident," Student A does not feel free to express all of her views on campus and, in particular, in her dormitory.

107.    Another Speech First member ("Student B") is a sophomore at the University. Student B uses the University's information resources, including his University email address.

108.    Student B considers himself a libertarian. He strongly supports the Second Amendment right to keep and bear arms, believes in a race-blind society, and has serious concerns that the "Me Too" movement will erode due process. Student B believes, among other things, that

affirmative action should be prohibited and that Justice Brett Kavanaugh was innocent of the accusations made against him and was properly confirmed to the U.S. Supreme Court.

109.     Student B credibly fears that expression of these and other views could be deemed "offensive," "harassing," "uncivil," or "rude" under the Institutional Rules or the Acceptable Use Policy, thus risking investigation and formal or informal punishment.

110.     Student B credibly fears that forceful speech on these issues could result in an accusation of a "bias incident" or "campus climate incident," thereby leading to an investigation by the CCRT and potentially formal or informal punishment. Student B also fears that being reported to or investigated by the CCRT could hurt him in future job or graduate-school opportunities.

111.     Because of these credible fears of investigation and punishment, Student B does not forcefully articulate his views when he is in class or in the presence of students who may disagree with him.

112.     Another Speech First member ("Student C") is a freshman at the University and lives in University housing. Student C uses the University's information resources.

113.     Student C holds views that are unpopular and in the minority on campus. He believes that the breakdown of the nuclear family has had many negative effects on society, he is strongly pro-life, he strongly supports the Second Amendment, and he believes that Justice Kavanaugh was treated unfairly during his confirmation proceedings.

114.     Student C credibly fears that expression of his strongly held views could be deemed "offensive," "harassing," "uncivil," or "rude" under the Institutional Rules, the Acceptable Use Policy, or the Residence Hall Manual, thus risking investigation and formal or informal punishment.

115.     Student C credibly fears that forceful speech on these issues could result in an accusation of a "bias incident" or "campus climate incident," triggering an investigation by the CCRT

and potential formal or informal punishment. Student C and his friends believe they need to "watch your mouth or you'll get in trouble with the CCRT."

116.     Student C is concerned about selective enforcement and viewpoint discrimination by the CCRT. He believes the CCRT has done little to nothing to protect students who have been shouted down, harassed, and "doxxed" for expressing views similar to his own.

117.     Student A, Student B, and Student C are examples of Speech First members at the University who are suffering concrete harm to their First and Fourteenth Amendment rights as a direct result of Defendants' actions.

118.     Student A, Student B, and Student C face a credible threat that the speech in which they seek to engage would be considered "harassment," "uncivil," "rude," or "offensive" and would thus violate the Institutional Rules, the Acceptable Use Policy, or the Residence Hall Manual. They also face a credible threat that their speech would be reported as a bias incident or campus climate incident and would lead to investigations and formal or informal punishment from the CCRT.

## COUNT I
### Violation of the First Amendment
### (Verbal Harassment Rule)

119.     Plaintiff repeats and realleges each of the prior allegations in this Complaint.

120.     The First Amendment prohibits State officials at public universities from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan University*, 55 F.3d 1177, 1182 (6th Cir. 1995).

121.     "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). A public university must carefully craft its regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* A regulation is unconstitutionally overbroad if "'a substantial number of its applications are unconstitutional.'" *Serafine v. Branaman*, 810 F.3d 354, 363

(5th Cir. 2016) (citations omitted). The Court must find such regulations facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

122.    "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.). Rather, "[t]he right to provoke, offend and shock lies at the core of the First Amendment. This is particularly so on college campuses. Intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). "[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988).

123.    The University's verbal-harassment rule is unconstitutionally overbroad. By its terms, it covers "speech, oral, written, or symbolic," including "personal attacks" based on "political views." The rule is not limited to constitutionally unprotected speech, such as obscenity or fighting words.

124.    While a university might be able to prohibit harassment that amounts to "discrimination" against a protected class that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999), the University's verbal-harassment rule goes far beyond that. It prohibits verbal harassment that is "offensive"—including "personal attacks" and "ridicule" of individuals for their "political views"— not just harassment that amounts to discrimination against a protected class. It prohibits harassment

that is "severe *or* pervasive *or* persistent"—including isolated incidents and one-on-one peer harassment—not just harassment that is "severe, pervasive *and* objectively offensive." And it prohibits harassment that "*interferes with* or *diminishes* the victim's ability to participate" in University programs, not just harassment that "effectively denie[s] [the victim] equal access to [the University's] resources and opportunities." *Id.* at 651.

125.    Further, the rule states that "[v]erbal harassment is *often* based on the victim's appearance, personal characteristics, or group membership, including but not limited to race, color, religion, national origin, gender, age, disability, citizenship, veteran status, sexual orientation, gender identity or gender expression, ideology, political views, or political affiliation." (Emphasis added.) This prohibition is viewpoint based and not limited to constitutionally unprotected expression.

126.    There are a substantial number of instances in which the University's harassment policy cannot be applied consistent with the First Amendment.

127.    This overbroad policy chills protected speech and expression.

128.    Defendants adopted this unconstitutional policy under color of state law.

## COUNT II
### Violation of the First and Fourteenth Amendments – Void-for-Vagueness
### (Verbal Harassment Rule)

129.    Plaintiff repeats and realleges each of the prior allegations in this Complaint.

130.    "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007).

131.    "With respect to the first goal, … '[a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its

meaning and differ as to its application, violates the first essential of due process of law.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)).

132.   "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Id.* (quoting *Grayned*, 408 U.S., at 108-09).

133.   This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

134.   The University's verbal-harassment rule is unconstitutionally vague.

135.   The rule purports to cover only speech that is "not necessary to the expression of any idea described in subsection 13-204(b)(2)"—*i.e.*, "any political, religious, philosophical, ideological, or academic idea." But the rule provides no guidance about the meaning of the phrase "necessary to express an idea," which effectively makes the University's disciplinary officials the arbiters of what speech is protected.

136.   The rule's vagueness is compounded by the language stating that verbal harassment "may consist of threats, insults, epithets, ridicule, personal attacks, or … harassing sexual speech" and "is often based on the victim's appearance, personal characteristics, or group membership, including but not limited to race, color, religion, national origin, gender, age, disability, citizenship, veteran status, sexual orientation, gender identity or gender expression, ideology, political views, or political affiliation." In other words, the University simultaneously tells students that verbal harassment "often"

includes "personal attacks ... based on the victim's ... political views," but cannot include speech that is "necessary to the expression of any ... political ... idea." It also tells students that verbal harassment "often" includes "insults ... based on the victim's ... religion," but cannot include speech that is "necessary to the expression of any ... religious ... idea." And it tells students that verbal harassment "often" includes "ridicule ... based on the victim's ... ideology," but cannot include speech that is "necessary to the expression of any ... ideological ... idea."

137.    These provisions provide no meaningful guidance to students about how to avoid committing a violation of the verbal-harassment policy.

138.    The absence of clear standards creates a serious risk that these provisions will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint expressed.

139.    Defendants adopted this unconstitutionally vague rule under color of state law.

## COUNT III
### Violation of the First Amendment
### (Acceptable Use Policy)

140.    Plaintiff repeats and realleges each of the prior allegations in this Complaint.

141.    Section 5.6 of the University's Acceptable Use Policy requires students to "[b]e civil. Do not send rude or harassing correspondence."

142.    Violations of the Acceptable Use Policy may lead to punishments that "include[], but [are] not limited to: [v]erbal warning, [r]evocation of access privileges, [d]isciplinary probation, [s]uspension from the university, [and] [c]riminal prosecution."

143.    The Acceptable Use Policy is unconstitutionally overbroad and could be used to punish protected speech and expression. There are a substantial number of instances in which the Acceptable Use Policy cannot be applied consistent with the First Amendment.

144.    This overbroad policy chills protected speech and expression.

145.     Defendants adopted this unconstitutional policy under color of state law.

## COUNT IV
### Violation of the First and Fourteenth Amendments – Void-for-Vagueness
### (Acceptable Use Policy)

146.     Plaintiff repeats and realleges each of the prior allegations in this Complaint.

147.     The University has provided no guidance to students about the meaning of "rude," "uncivil," or "harassing" in its Acceptable Use Policy, nor has it advised students about how to avoid violating these prohibitions.

148.     The absence of clear standards creates a serious risk that these provisions will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint expressed.

149.     These provisions of the Acceptable Use Policy are thus void for vagueness.

150.     Defendants adopted this unconstitutionally vague rule under color of state law.

## COUNT V
### Violation of the First Amendment
### (Residence Hall Civility/Harassment Policy)

151.     Plaintiff repeats and realleges each of the prior allegations in this Complaint.

152.     The University's Residence Hall Manual sets forth binding policies for students who live in University housing, violations of which can subject students to formal or informal discipline.

153.     The Manual states that "[u]ncivil behaviors and language that interfere with the privacy, health, welfare, individuality, or safety of other persons are not permitted." The incivility rule prohibits a wide array of protected speech, including speech that is not "respectful of the[] community" and speech that "interfere[s]" with another person's "individuality."

154.     Another rule in the Manual prohibits "harassment and intimidation," including "verbal abuse." According to the Manual, "harassment and intimidation" include "acts of racism, sexism,

heterosexism, cissexism, ageism, ableism, and any other force that seeks to suppress another individual or group of individuals."

155.    The Manual's prohibitions on "incivility" and "harassment and intimidation" encompass protected speech and expression, and there are a substantial number of instances in which those rules cannot be applied consistent with the First Amendment.

156.    These overbroad prohibitions chill protected speech and expression.

157.    Defendants adopted these unconstitutional rules under color of state law.

## COUNT VI
### Violation of the First and Fourteenth Amendments – Void-for-Vagueness
### (Residence Hall Civility/Harassment Policy)

158.    Plaintiff repeats and realleges each of the prior allegations in this Complaint.

159.    The Manual's incivility rule does not define the terms "respectful," "civil," or "uncivil," nor does it define what it means to "interfere" with another student's "individuality."

160.    The Manual's "harassment and intimidation" rule does not define the terms "racism, sexism, heterosexism, cissexism, ageism, [and] ableism," nor does it explain what it means to "suppress another individual or group of individuals."

161.    The absence of clear standards creates a serious risk that these provisions will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint expressed.

162.    These provisions of the Manual are thus void for vagueness.

163.    Defendants adopted these unconstitutionally vague rules under color of state law.

## COUNT VII
### Violation of the First Amendment
### (CCRT)

164.    Plaintiff repeats and realleges each of the prior allegations in this Complaint.

165.    The CCRT receives and publishes reports, conducts investigations, imposes informal punishment, and partners with other officials to impose formal punishment on students accused of "bias incidents" or "campus climate incidents."

166.    The University defines "bias incidents" and "campus climate incidents" as occurring when "individuals … believe they have been discriminated against or have experienced threatened or actual violence on the basis of their race, color, religion, national origin, gender, gender identity or gender expression, age, disability, citizenship, veteran status, sexual orientation, ideology, political views, or political affiliation to report such incidents as provided in this policy."

167.    Examples of bias incidents, according to the University, include "a student organization hosting a party with a racist theme," "somebody … creat[ing] a hostile or offensive classroom environment," "[i]nsulting and insensitive posts on social media or group chat apps pertaining to race, gender identity, or sexual orientation," "[d]erogatory comments made on a … course Facebook page," "[f]aculty commentary in the classroom perceived as derogatory and insensitive," "[h]ostile and insensitive treatment in interaction with a campus department/unit," "verbal[] harassment on and off campus," "[s]tudent organizations participating in traditions perceived as insensitive or based on stereotypes," and "[i]nsulting or insensitive online posts pertaining to race, gender identity, or sexual orientation."

168.    The University's policies on "bias incidents" and "campus climate incidents" encompass protected speech and expression, and there are a substantial number of instances in which those policies cannot be applied consistent with the First Amendment.

169.    The CCRT mechanism also threatens to subject students to investigations and administrative procedures based solely on the content of their speech.

170.    These overbroad policies chill protected speech and expression.

171.    The CCRT and its prohibitions on bias incidents and campus climate incidents thus violate the First Amendment.

172.    Defendants adopted these unconstitutional policies under color of state law.

## COUNT VIII
### Violation of the First and Fourteenth Amendments – Void-for-Vagueness (CCRT)

173.    Plaintiff repeats and realleges each of the prior allegations in this Complaint.

174.    Even though "bias incidents" and "campus climate incidents" can subject students to investigations and formal or informal discipline, the University has offered no meaningful guidance about the meaning of these terms or how students can avoid committing a violation.

175.    The absence of clear standards creates a serious risk that these provisions will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint expressed.

176.    The CCRT and its prohibitions on bias incidents and campus climate incidents are thus void for vagueness.

177.    Defendants adopted these unconstitutionally vague policies under color of state law.

**WHEREFORE**, Plaintiff Speech First respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A.      A declaratory judgment that the University's prohibition on "verbal harassment" violates the First and Fourteenth Amendments;

B.      A declaratory judgment that the University's prohibitions on incivility, rudeness, and harassment in section 5.6 of the Acceptable Use Policy violate the First and Fourteenth Amendments;

C.      A declaratory judgment that the University's prohibitions on harassment, intimidation, and incivility in the Residence Hall Manual violate the First and Fourteenth Amendments;

D.      A declaratory judgment that the CCRT and its prohibitions on "bias incidents" and "campus climate incidents" violate the First and Fourteenth Amendments;

E.      A permanent injunction prohibiting Defendants from taking any actions to investigate, threaten, or punish students for violations of the verbal-harassment policy, section 5.6 of the Acceptable Use Policy, or the "Harassment/Intimidation" or "Incivility" rules in the Residence Hall Manual;

F.      A permanent injunction prohibiting Defendants from using the CCRT to investigate, threaten, or punish students (including informal punishments) for "bias incidents" or "campus climate incidents";

G.      A preliminary injunction granting the relief specified above during the pendency of this action;

H.      Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988 and all other applicable laws; and

I.      All other further relief to which Plaintiff might be entitled.

Respectfully submitted,

Dated: December 12, 2018

*Cameron T. Norris*

William S. Consovoy (pro hac vice application
forthcoming)
Jeffrey M. Harris (pro hac vice application
forthcoming)
J. Michael Connolly (pro hac vice application
forthcoming)
Cameron T. Norris (pro hac vice application and
application for admission filed)
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
(703) 243-9423
will@consovoymccarthy.com
jeff@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com

Counsel for Plaintiff Speech First, Inc.