IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| SPEECH FIRST, INC., *Plaintiff*, <br><br> v. <br><br> GREGORY L. FENVES, et al., *Defendants*. | Case No. 1:18-cv-1078-LY <br><br> **ORAL HEARING REQUESTED** |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

RULE CV-7(i) STATEMENT ................................................................................................. v

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

I.      The University's Vague and Overbroad Prohibitions on "Harassment," "Intimidation," "Incivility," and "Rudeness" ............................................................................................. 3

II.     The University's "Campus Climate Response Team" ................................................... 4

III.    Speech First and This Litigation ..................................................................................... 5

ARGUMENT ........................................................................................................................... 6

I.      Speech First is likely to prevail on the merits of its claims. ............................................ 6

    A.    The First and Fourteenth Amendments prohibit vague and overbroad regulations capturing substantial amounts of protected speech. .................................................. 6

    B.    The University's bans on "harassment," "intimidation," "incivility," and "rudeness" are unconstitutionally overbroad and void for vagueness. ........................................ 7

    C.    The University's policies regarding "bias incidents" and "campus climate incidents" are unconstitutionally overbroad and void for vagueness. ........................................ 9

II.     Speech First satisfies the remaining preliminary-injunction criteria. ........................... 10

CONCLUSION ..................................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ............................................................................................................. 7

*Bair v. Shippensburg Univ.*,
  280 F. Supp. 2d 357 (M.D. Pa. 2003) ............................................................................. 6, 10

*Byrum v. Landreth*,
  566 F.3d 442 (5th Cir. 2009) ............................................................................................. 10

*Doe v. Univ. of Mich.*,
  721 F. Supp. 852 (E.D. Mich. 1989) ................................................................................... 8

*Elrod v. Burns*,
  427 U.S. 347 (1976) ........................................................................................................... 10

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ............................................................................................................. 7

*Justice for All v. Faulkner*,
  2004 WL 3957872 (W.D. Tex. Mar. 3, 2004) .................................................................... 1

*Papish v. Bd. of Curators of Univ. of Mo.*,
  410 U.S. 667 (1973) ............................................................................................................. 1

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
  600 F.3d 562 (5th Cir. 2010) ............................................................................................... 6

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ............................................................................................................. 6

*Saxe v. State College Area School Dist.*,
  240 F.3d 200 (3d Cir. 2001) ............................................................................................ 6, 9

*Serafine v. Branaman*,
  810 F.3d 354 (5th Cir. 2016) ............................................................................................... 7

*Smith v. Goguen*,
  415 U.S. 566 (1974) ............................................................................................................. 7

*Solid Rock Found. v. Ohio State Univ.*,
  478 F. Supp. 96 (S.D. Ohio 1979) ....................................................................................... 1

*Street v. New York*,
  394 U.S. 576 (1969) ............................................................................................................. 6

*Texans for Free Enterprise v. Tex. Ethics Comm'n*,
  732 F.3d 535 (5th Cir. 2013) ............................................................................................. 10

*Texas v. Johnson*,
  491 U.S. 397 (1989) ............................................................................................................. 6

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) .................................................................................................................. 6

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000) .................................................................................................................. 6

*United States v. Wallington*,
    889 F.2d 573 (5th Cir.1989) ..................................................................................................... 7

*Village of Hoffman Estates v. Flipside,*
    455 U.S. 489 (1982) .................................................................................................................. 7

*Virginia v. Hicks*,
    539 U.S. 113 (2003) .................................................................................................................. 9

*Wollschlaeger v. Gov'r of Fla.*,
    848 F.3d 1293 (11th Cir. 2017) (en banc) ............................................................................... 8

**Other Authorities**

FIRE, Bias Response Team Report 2017 (Feb. 2017) ................................................................ 10

Jeffrey Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*,
    The New Republic (Mar. 30, 2016) ....................................................................................... 10

President Kay Norton's State of the University Address,
    UNC (Sept. 7, 2016) .............................................................................................................. 10

*University of Iowa Changing Course on Bias Response Team*,
    Iowa City Press-Citizen (Aug. 18, 2016) ............................................................................... 10

**RULE CV-7(i) STATEMENT**

Plaintiff has conferred with counsel for Defendants, who stated that that they oppose this motion.

**INTRODUCTION**

"[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). After all, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979). Yet the University of Texas at Austin and its officials have created an elaborate investigatory and disciplinary apparatus to suppress, punish, and deter speech that other students deem "offensive," "biased," "intimidating," "uncivil," or "rude." Although this Court previously instructed the University that the First Amendment does "not apply with less force on [its] campus," *Justice for All v. Faulkner*, 2004 WL 3957872, at *4 (W.D. Tex. Mar. 3, 2004), the University has failed to heed that admonition.

Plaintiff Speech First, Inc. is a nationwide membership organization of students, alumni, and other concerned citizens—including current students who attend the University—that is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. Speech First respectfully requests a preliminary injunction enjoining several University policies that have a profound chilling effect on its members' protected speech and expression.

First, the University has crafted a series of vague and overbroad prohibitions on student speech. The University's ban on "verbal harassment" extends to "offensive" speech, including "insults, epithets, ridicule, [and] personal attacks" "based on the victim's … personal characteristics, or group membership, including but not limited to … ideology, political views, or political affiliation." The University's Acceptable Use Policy for its information-technology resources (such as email and internet access) prohibits communications that are "uncivil," "rude," or "harassing." And the University's Residence Hall Manual—which regulates the thousands of students who live in University housing—proscribes yet another version of "harassment," which it defines as including "racism,

1

sexism, heterosexism, cissexism, ageism, ableism, and any other force that seeks to suppress another individual or group of individuals." All of these prohibitions are backed by the threat of investigation and formal or informal discipline, yet they encompass wide swaths of protected expression and provide no clear or objective guidance to students about how to comply.

Second, the University supplements these prohibitions with a Campus Climate Response Team (CCRT), a team of senior University administrators who investigate and respond to "campus climate incidents" and "bias incidents." The University expansively defines such incidents as any perceived discrimination on the basis of "race, color, religion, national origin, gender, gender identity or gender expression, age, disability, citizenship, veteran status, sexual orientation, ideology, political views, or political affiliation." As examples of such incidents, the University has listed speech that someone perceives as "offensive," "insulting," or "insensitive." Students accused of engaging in "bias incidents" risk an investigation from University officials and sanctions ranging from "diversity training and education" to formal discipline. Yet the definition of "campus climate incident"—the trigger for these consequences—encompasses wide swaths of protected expression and provides no meaningful standards about what will be deemed a violation. The CCRT is anathema to the First Amendment and poses a grave risk of chilling open and unfettered discourse on campus.

Speech First is likely to prevail on the merits of its constitutional claims and readily meets the remaining preliminary-injunction criteria. Deprivation of a core constitutional right, even for a brief period of time, constitutes irreparable injury, and there is no question that the public has a strong interest in ensuring free speech and expression at state-funded universities. Speech First thus respectfully requests that this Court grant a preliminary injunction and reaffirm that the First Amendment applies with full force even to speech that the University deems "offensive," "biased," "uncivil," or "rude."

**BACKGROUND**

I.   **The University's Vague and Overbroad Prohibitions on "Harassment," "Intimidation," "Incivility," and "Rudeness"**

Because the University is a public institution, its policies must comply with the First and Fourteenth Amendments. Yet the University has adopted a number of policies that limit some students' speech and expression in order to prevent others from taking offense.

***The Institutional Rules:***  The University's Undergraduate Catalog is the document of authority for all students. It contains the Institutional Rules on Student Services and Activities, including a chapter that governs "Speech, Expression, and Assembly." Students who violate these rules are subject to discipline.

Under the heading "Prohibited Expression," the Institutional Rules prohibit "verbal harassment," which is defined as "hostile or offensive speech" that (A) "is not necessary to the expression of any" "political, religious, philosophical, ideological, or academic idea," (B) "is sufficiently severe, pervasive, or persistent to create an objectively hostile environment that interferes with or diminishes the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University," and (C) "personally describes or is personally directed to one or more specific individuals." "Verbal harassment," the rule continues, "may consist of threats, insults, epithets, ridicule, personal attacks, or … harassing sexual speech …. Verbal harassment is often based on the victim's appearance, personal characteristics, or group membership, including but not limited to race, color, religion, national origin, gender, age, disability, citizenship, veteran status, sexual orientation, gender identity or gender expression, ideology, political views, or political affiliation." The verbal-harassment rule "applies to all speech on the campus." Norris Decl., Ex. A §13-204.

***The Residence Hall Manual:***  Nearly one in five University students lives in University housing. The 2018-2019 Residence Hall Manual (Manual) sets forth the rules that govern the conduct of students in University residences. A student who violates these "binding" rules can be punished in

3

several ways, including reprimands, "educational sanctions," room changes, removal from University housing, and University discipline. Ex. C at ii, 27. The Manual's "Incivility" rule states: "Uncivil behaviors and language that interfere with the privacy, health, welfare, individuality, or safety of other persons are not permitted." *Id.* at 18. Another rule prohibits "harassment and intimidation," which are defined as including "racism, sexism, heterosexism, cissexism, ageism, ableism, and any other force that seeks to suppress another individual or group of individuals." *Id.*

**The Acceptable Use Policy:** The University maintains IT resources, including computer devices, applications, email addresses, and internet access. All students using these services must comply with the Acceptable Use Policy (Policy). If a student violates the Policy, the potential punishments "include[], but [are] not limited to: [v]erbal warning, [r]evocation of access privileges, [d]isciplinary probation, [s]uspension from the university, [and] [c]riminal prosecution." Ex. B §7.1. Section 5.6 of the Policy requires students to "[b]e civil. Do not send rude or harassing correspondence." Section 5.6 adds that "[i]f someone asks you to stop communicating with him or her, you should. If you fail to do so, the person can file a complaint and you can be disciplined." The Policy does not define the vague, subjective terms "civil," "rude," or "harassing."

## II. The University's "Campus Climate Response Team"

The University supplements these prohibitions with the Campus Climate Response Team (CCRT), a team of senior University administrators (including police officers and disciplinarians from the Dean of Students Office) that was established in the spring of 2011 to investigate and respond to so-called "bias incidents" and "campus climate incidents." Ex. J at 6-8.

The definitions of "bias incident" and "campus climate incident" are broad and vague. Under the heading "Campus Climate Incident," the University's Policy on Hate and Bias Incidents states, "The University strongly encourages individuals who believe they have been discriminated against or have experienced threatened or actual violence on the basis of their race, color, religion, national

4

origin, gender, gender identity or gender expression, age, disability, citizenship, veteran status, sexual orientation, ideology, political views, or political affiliation to report such incidents." Ex. D. Examples of "bias incidents" include "a student organization hosting a party with a racist theme," a "hostile or offensive classroom environment," and "[i]nsulting and insensitive posts on social media or group chat apps pertaining to race, gender identity, or sexual orientation." Ex. E; Ex. J at 14.

The CCRT implores students and others to report bias incidents and campus climate incidents "as soon as possible after their occurrence." Ex. H. Such reports can be filed online, in person, or by phone, and can even be submitted anonymously. *Id.*; Ex. G; Ex. K; Ex. I. Once a report is filed, the "core functions" of the CCRT include "[g]athering information and managing the specific [bias] incident"; "[s]upporting individuals involved, including both those targeted by the incident and those who initiated the incident"; "[e]valuating the response process post incident"; and "[c]oordinating, when appropriate, activities with other campus-wide entities." Ex. F. The CCRT's responses to bias incidents have included referrals for formal discipline; "[i]nitiation of an informal non-discrimination policy resolution process"; "[d]iversity training and education"; and "[e]ducational conversations or meetings with those initiating an incident regarding the intent and impact of their actions." Ex. J at 16-17. The CCRT maintains an online log of reported bias incidents, and it received more than 100 such reports in the 2017-2018 school year. Ex. L; Ex. M.

### III. Speech First and This Litigation

Speech First is a nationwide membership organization with several members who are current students at the University. *See* Neily Decl. These members want to engage in open, vigorous, and provocative debate and discussion about a wide array of controversial topics. *Id.* Yet Speech First's members are being chilled from openly articulating their views due to a credible fear that they will be accused of violating the challenged policies, or will be investigated or punished by the CCRT for engaging in "campus climate incidents." *Id.*

5

**ARGUMENT**

A plaintiff seeking a preliminary injunction must show that "'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 568 (5th Cir. 2010).

**I.    Speech First is likely to prevail on the merits of its claims.**

    **A.    The First and Fourteenth Amendments prohibit vague and overbroad regulations capturing substantial amounts of protected speech.**

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). The Supreme Court has held time and again, both within and outside the school context, that the government may not prohibit speech based on the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969); *accord Street v. New York*, 394 U.S. 576, 592 (1969); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 414 (1992).

Relatedly, the government may not prohibit speech based on "the emotive impact that its offensive content may have on a listener." *Saxe v. State College Area School Dist.*, 240 F.3d 200, 209 (3d Cir. 2001). Indeed, "[c]ommunications which provoke a response, especially in the university setting, have historically been deemed an objective to be sought after rather than a detriment to be avoided." *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 370-71 (M.D. Pa. 2003). "We are expected to protect our own sensibilities simply by averting our eyes." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000) (cleaned up).

Under the "overbreadth" doctrine, a policy violates the First Amendment if "'a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep.'" *Serafine v. Branaman*, 810 F.3d 354, 364 (5th Cir. 2016). The "constitutional defect of an overbroad

6

restraint on speech lies in the risk that the wide sweep of the restraint may chill protected expression." *United States v. Wallington*, 889 F.2d 573, 576 (5th Cir.1989); *accord Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

In evaluating a vagueness challenge, moreover, a court considers whether the policy (1) "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and (2) "provide[s] explicit standards for those who apply [it]" to avoid arbitrary and discriminatory applications. *Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972). An even more stringent vagueness standard applies when a policy "is capable of reaching expression sheltered by the First Amendment." *Smith v. Goguen,* 415 U.S. 566, 573 (1974); *accord Vill. of Hoffman Estates v. Flipside,* 455 U.S. 489, 499 (1982).

### B.     The University's bans on "harassment," "intimidation," "incivility," and "rudeness" are unconstitutionally overbroad and void for vagueness.

The University's prohibitions on "harassment," "incivility," and "rudeness" vary in their particulars but all suffer from the same constitutional flaws: they proscribe substantial amounts of protected expression and provide no meaningful guidance to students about how to avoid a violation.

The verbal-harassment rule in the Institutional Rules is not limited to constitutionally unprotected speech, such as obscenity, fighting words, true threats, or incitement of imminent violence. It instead prohibits speech that is "offensive"—including "personal attacks" and "ridicule" of individuals for their "political views." The rule's vagueness—and potential breadth—is amplified by its list of supposedly harassing speech, including "insults, epithets, ridicule, [and] personal attacks" "based on the victim's … personal characteristics, or group membership, including but not limited to … ideology, political views, or political affiliation."

The University will surely note in response that the definition of harassment is limited to speech that is "not necessary to the expression" of "any political, religious, philosophical, ideological, or academic idea." But what this proviso means is anyone's guess. *See Wollschlaeger v. Gov'r of Fla.*, 848

7

F.3d 1293, 1319 (11th Cir. 2017) (en banc) (holding that the phrase "unnecessarily harassing" was void for vagueness). A student who is forcefully advocating for a controversial idea (or rebutting someone else's) may use heated rhetoric, hyperbole, satire, or strong language that another student finds offensive. None of this is strictly "necessary" to the expression of the idea, but it all remains core protected speech. Under the Institutional Rules' definition of verbal harassment, the University's disciplinary officials are effectively the arbiters of what speech is protected, and "[s]tudents of common understanding [a]re necessarily forced to guess at whether a comment about a controversial issue would later be found to be sanctionable." *Doe v. Univ. of Mich.,* 721 F. Supp. 852, 867 (E.D. Mich. 1989).

The definitions of "harassment," "intimidation," and "incivility" in the Residence Hall Manual are even more egregious. According to the Manual, "[u]ncivil behaviors and language that interfere with the privacy, health, welfare, individuality, or safety of other persons are not permitted." Ex. C at 18. Another rule prohibits "harassment and intimidation," which are defined as including "racism, sexism, heterosexism, cissexism, ageism, ableism, and any other force that seeks to suppress another individual or group of individuals." *Id.* Students who violate the Manual can face serious consequences—ranging from informal sanctions to housing reassignments and formal discipline—yet these rules are utterly devoid of any objective content and, by their terms, encompass protected speech. What does it mean to "interfere" with another student's "individuality"? How can a student avoid engaging in "cissexism" or speech that is deemed to "suppress another individual"? Nobody knows. Nor does anyone know what the prohibitions on "rudeness," "incivility," and "harassment" in the Acceptable Use Policy mean. They are similarly vague and overbroad.

As then Judge-Alito emphasized in *Saxe*, "[l]oosely worded anti-harassment laws" pose a serious risk of "regulat[ing] deeply offensive and potentially disruptive categories of speech based, at least in part, on subject matter and viewpoint." 240 F.3d at 207. The inevitable effect of the

8

University's vague and expansive prohibitions on speech is to chill free expression and open discourse, as students choose not to speak rather than risk investigation or punishment because another student might take offense. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) ("[T]he threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, … harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas.").

    **C.**    **The University's policies regarding "bias incidents" and "campus climate incidents" are unconstitutionally overbroad and void for vagueness.**

The University's policies regarding "bias incidents" and "campus climate incidents"—which are enforced by the CCRT—are also unconstitutionally vague and overbroad and pose a grave risk of chilling protected speech and expression. The University expansively defines such incidents as occurring when "individuals … believe they have been discriminated against or have experienced threatened or actual violence on the basis of their race, color, religion, national origin, gender, gender identity or gender expression, age, disability, citizenship, veteran status, sexual orientation, ideology, political views, or political affiliation." As examples of such incidents, the University has listed speech in the classroom, on social media, or at a student-organization event that someone perceives as "offensive," "insulting," or "insensitive." A student accused (often anonymously) of one of these purported misdeeds may then face an investigation by the CCRT, public reporting of the "incident," and sanctions ranging from "diversity training and education" to formal discipline.

In short, based on expansive definitions of misconduct that unquestionably encompass protected speech, students can find themselves reported, investigated, logged, and potentially punished. And the fear of these consequences is not just hypothetical, as the CCRT has received more than 1,000 reports of "bias" since 2012. Ex. J at 11. The message to students is clear: if you speak in

9

a manner that others might deem "offensive," "insulting," or "insensitive," serious consequences will follow. The CCRT is anathema to free expression and open discourse.[*]

## II.     Speech First satisfies the remaining preliminary-injunction criteria.

Because Speech First is likely to prevail on its constitutional challenges to the University's speech codes and the CCRT, the remaining elements of the preliminary-injunction analysis—irreparable harm, balancing of the equities, and the public interest—all favor granting preliminary relief. *See, e.g.*, *Bair*, 280 F. Supp. 2d at 373; *Texans for Free Enterprise v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## CONCLUSION

This Court should grant Speech First's motion for a preliminary injunction and enjoin Defendants from taking any steps to investigate, threaten, or punish students for "harassment," "intimidation," "incivility," or "rudeness" under the challenged policies; and enjoin Defendants from using the CCRT to investigate, log, threaten, or punish students (including informal punishments) for "campus climate incidents" or "bias incidents."

---

[*] A 2017 report from FIRE found that bias-response teams lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." Bias Response Team Report 2017, at 28 (Feb. 2017), bit.ly/2P9iEaj; *see also* Jeffrey Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), bit.ly/1SaAiDB (arguing that bias-response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints"). The experiences of the University of Northern Colorado and the University of Iowa bear this out. *See* President Kay Norton's State of the University Address 3-4, UNC (Sept. 7, 2016), bit.ly/2FdMdE5; *University of Iowa Changing Course on Bias Response Team*, Iowa City Press-Citizen (Aug. 18, 2016), bit.ly/2Ph03Ku.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: December 21, 2018 | <u>/s/ *Cameron T. Norris*</u> |

William S. Consovoy
Jeffrey M. Harris
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard, Suite 700
Arlington, VA 22201
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Plaintiff Speech First, Inc.*

11

## CERTIFICATE OF SERVICE

I certify that on December 21, 2018, I electronically filed this motion with the Clerk of Court using the CM/ECF system. I also certify that, after obtaining consent to service by email, I emailed this motion to the following:

James E. Davis
2304 White Ave., FAC 438 (G4800)
P.O. Box R
Austin, TX 78713
512-471-1241
vpla@austin.utexas.edu

                                                            */s/ Cameron T. Norris*
                                                            Cameron T. Norris