IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SPEECH FIRST, INC., *Plaintiff*, | § § § | |
| v. | § | CIVIL ACTION NO. 1:18-cv-1078-LY |
| GREGORY L. FENVES, *Defendant*. | § § § | |

**DEFENDANT GREGORY L. FENVES' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


Table of Authorities .......... ii

Table of Exhibits .......... iii

Introduction .......... 1

Argument .......... 2

I. Plaintiff Is Unlikely To Prevail on the Merits .......... 2

A. Plaintiff Lacks Standing .......... 2

1. The Institutional Rules .......... 3

2. The Acceptable Use Policy .......... 5

3. The Residence Hall Manual .......... 5

4. The Campus Climate Response Team .......... 6

5. The University's Enforcement of Its Speech Policy .......... 7

B. The Policies at Issue Are Not Overbroad or Vague .......... 9

II. Additional Factors Weigh Against a Preliminary Injunction .......... 10

Conclusion .......... 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Pastides*,
900 F.3d 160 (4th Cir. 2018) ..... 3

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ..... 3

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ..... 9

*Davis v. Monroe County Board of Education*,
526 U.S. 629 (1999) ..... 4, 9

*Garcia-Carias v. Holder*,
697 F.3d 257 (5th Cir. 2012) ..... 2

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ..... 10

*Kolender v. Lawson*,
461 U.S. 352 (1983) ..... 10

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..... 2

*Moore v. Brown*,
868 F.3d 398 (5th Cir. 2017) ..... 2

*Munaf v. Geren*,
553 U.S. 674 (2008) ..... 2

*OCA-Greater Hous. v. Texas*,
867 F.3d 604 (5th Cir. 2017) ..... 2

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) ..... 9

*Speech First, Inc. v. Schlissel, et al.*,
No. 2:18-cv-11451-LVP-EAS (E.D. Mich. June 11, 2018), ECF 14 ..... 9

*Susan B. Anthony List v. Driehaus*,
537 U.S. 149 (2014) ..... 3

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ..... 2

## TABLE OF EXHIBITS

| Exhibit | | Description |
|---|---|---|
| **A** | | **Declaration of Dr. Gregory L. Fenves** |
| A | 1 | Statement on University Review of Nov. 13 Incident, dated March 8, 2016 |
| A | 2 | Message from President Fenves on Campus Climate and Town Hall, dated March 8, 2017 |
| **B** | | **Declaration of Dr. Soncia Reagins-Lilly** |
| B | 1 | Chapter 11, Student Discipline and Conduct |
| B | 2 | Acceptable Use Policy for Students |
| B | 3 | Costume and Theme Selection Guide |
| **C** | | **Declaration of John Adams Bird** |
| C | 1 | Video of the November 15, 2016, Student Government Meeting Regarding A.R. 15 |
| C | 2 | Speech, Respect and Support During Difficult Times, A Message from Leonard Moore, Vice President for Diversity and Community Engagement, The University of Texas at Austin, dated October 3, 2018 |
| C | 3 | Picture of the event featuring Charlie Kirk speaking at the University of Texas at Austin |
| **D** | | **Declaration of Dr. Andel Fils-Aime** |
| D | 1 | *Filed Under Seal Pursuant to Protective Order* – Incident Report, dated October 2, 2018 |
| D | 2 | *Filed Under Seal Pursuant to Protective Order* – Letter of Appeal Decision, dated November 19, 2018 |
| D | 3 | Video taken during the event featuring Charlie Kirk speaking at The University of Texas at Austin |
| **E** | | **Declaration of Edna Dominguez** |
| E | 1 | Resources Webpage, Campus Climate Response Team |
| **F** | | **Declaration of Susan Buckenmeyer** |
| **G** | | **Declaration of Captain Charles Bonnet** |
| G | 1 | Body camera footage taken during the October 2, 2018, event hosted by the Young Conservatives of Texas at The University of Texas at Austin |
| G | 2 | Body camera footage taken during the October 24, 2018, event featuring Charlie Kirk speaking at The University of Texas at Austin |
| G | 3 | Video taken during the event featuring Charlie Kirk speaking at The University of Texas at Austin |
| **H** | | **Declaration of Kevin Helgren** |
| H | 1 | Excerpt of a news broadcast filmed during an event held at The University of Texas at Austin by the Young Conservatives of Texas |

| Exhibit | | Description |
| --- | --- | --- |
| **I** | | **Declaration of Kevin Kunec** |
| I | 1 | Transcript of the November 15, 2016, Student Government Meeting Regarding A.R. 15 (Exhibit C-1) |
| I | 2 | Transcript of the October 2, 2018, Young Conservatives of Texas Event Body Camera Footage (Exhibit G-1) |
| I | 3 | Transcript of the October 24, 2018, Charlie Kirk Event Body Camera Footage (Exhibit G-2) |
| I | 4 | Transcript of the October 24, 2018, Charlie Kirk Event Footage (Exhibits D-3, G-3) |
| I | 5 | "The College Fix: For $5, This Free Speech Group Will Help You Sue Your University for Censorship", from the Speech First website, dated January 17, 2019 |

## INTRODUCTION

Freedom of expression is essential for The University of Texas at Austin to carry out its mission as an institution of higher education. Consistent with that mission, the University robustly protects every student's fundamental right to free speech and fosters open debate and dialogue on campus. As President Fenves recently stated: "Free speech is critical to the exchange of ideas that must happen at a university. We don't learn by quieting voices. We learn by listening to one another and, when we disagree, by engaging in thoughtful dialogue. Protecting free speech means protecting the rights of every perspective, even if that perspective is objectionable." Ex. A-2; *see also* Ex. A, ¶¶ 2-10 (Fenves Dec.).[1]

The University's commitment to protect free speech rights, and to enhance student understanding of those rights, is embodied in its policies. The University's Institutional Rules governing *Speech, Expression, and Assembly* commence with the guiding principle that "[t]he freedoms of speech, expression, and assembly are fundamental rights of all persons and are central to the mission of the University," and proceed to guarantee the right of all students, faculty, and staff "to express their views, individually or in organized groups […] on any topic, in all parts of the campus […]." ECF 8-2, p. 4 (Sec. 13-101 (a), (c)).

Plaintiff Speech First, Inc., a Washington D.C.-based advocacy group with no connection to the University, has filed suit claiming the University's policies suppress speech, and it has requested a preliminary injunction. Mot. 1 (asserting that the University policies are designed to "suppress, punish, and deter" any speech on campus that other students deem "offensive"). Plaintiff's assertions are demonstrably false because they are premised entirely on incomplete, grossly inaccurate descriptions of the University's policies. Plaintiff repeatedly offers selective quotations of policy language out of context, omitting critical provisions that refute its false narrative of speech suppression. In so doing, Plaintiff runs afoul of a bedrock

---

[1] In support of its Response, the University is submitting several declarations, including the declarations of seven University officials, addressing how the University's policies are applied on campus. The University is also filing objections to the Nicole Neily declaration submitted by Plaintiff, which is substantially comprised of inadmissible testimony.

rule of interpretation: "a [policy] provision cannot be read in isolation, but necessarily derives meaning from the context provided by the surrounding provisions, as well as the broader context of the [policy] as a whole." *Garcia-Carias v. Holder*, 697 F.3d 257, 263 (5th Cir. 2012). Plaintiff likewise misrepresents the University's record of construing and enforcing its policies to protect, rather than suppress, freedom of expression. The result is a caricature of the University's position on free speech, untethered to a complete, accurate reading of the University's policies as written and applied. The motion should be denied.

## ARGUMENT

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). It should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). Plaintiff fails every requirement for obtaining a preliminary injunction: (1) it does not have a substantial likelihood of success on the merits—indeed, it does not even have standing; (2) no irreparable injury will occur if the injunction is not granted because the anonymous students it purports to represent face no credible threat of disciplinary action; (3) an injunction would cause substantial harm to the University and its students; and (4) an injunction would disserve the public interest. *Moore v. Brown*, 868 F.3d 398, 402-03 (5th Cir. 2017).

### I. PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS

#### A. Plaintiff Lacks Standing

Because Plaintiff is an advocacy group lacking any connection with the University, it relies upon the doctrine of "associational standing." Thus, Speech First has standing only if its members—Students A, B and C—would have standing. *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); *see also* Compl., ECF 1, ¶¶ 95-118. The students, in turn, must have suffered an injury in fact that is concrete and actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

In this First Amendment facial challenge, the injury-in-fact requirement may be satisfied by showing that the students have "an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 537 U.S. 149, 159 (2014). When students claim to have self-censored due to a fear of prosecution, such fear must be objectively reasonable, and not "imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979).

Plaintiff lacks standing because there is no credible threat that Students A, B and C will face any disciplinary action from the University for expressing their opinions, and their purported self-censorship is based on illusory apprehensions regarding the University's policies. *See Abbott v. Pastides*, 900 F.3d 160, 175-80 (4th Cir. 2018) (student groups lacked standing to assert facial challenge to university harassment policy because they failed to show any credible threat that the university would enforce the policy against them). Students A, B and C assert that they would like to discuss and debate certain political and ideological topics on campus, such as immigration issues, affirmative action, support for President Trump, support for Israel, the Second Amendment, and support for the confirmation of Justice Brett Kavanaugh to the U.S. Supreme Court. *See* ECF 1, ¶¶ 95-118. They allegedly fear that expression of these strongly held views could be deemed "offensive," "harassing," "uncivil," or "rude" under University policies, "thus risking investigation and formal or informal punishment." *See id.* They also allegedly fear that "forceful speech" on the referenced political and ideological issues "could result in an accusation of a 'bias incident' or 'campus climate incident,' triggering an investigation by the [Campus Climate Response Team] and potential formal or informal punishment." *See id.*

These purported fears are groundless. Read fairly and in their entirety, the University's policies protect, rather than suppress, the speech in which Students A, B and C wish to engage.

**1. The Institutional Rules**

Plaintiff claims that the University's "verbal harassment" prohibition in section 13-204 of the Institutional Rules (the "Rules") threatens investigation and punishment for speech and debate about the political and ideological topics referenced in the Complaint. The plain text of section 13-204 refutes this

claim. The University has a dual commitment to (1) protecting academic freedom and freedom of expression, and (2) maintaining a school environment free from illegal discrimination and harassment. The University's strong protection of free speech is embodied in section 13-101 of the Rules, as described above. *See supra* Introduction.

The University's commitment to maintaining an environment free from illegal discrimination and harassment is embodied in section 13-204. In this regard, it is undisputed that under *Davis v. Monroe County Board of Education*, 526 U.S. 629, 651 (1999), student-on-student harassment is actionable under federal law. Section 13-204 tracks the essence of the *Davis* standard, prohibiting as "verbal harassment" only "hostile or offensive speech" that is "sufficiently severe, pervasive, or persistent to create an objectively hostile environment that interferes with or diminishes the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University." ECF 8-2, p. 6 (section 13-204(b)(1)(B)). Section 13-204(e) confirms that its verbal harassment prohibition must be construed narrowly in accordance with controlling precedent: "Verbal harassment has been interpreted very narrowly by the federal courts. Policies on verbal harassment or hate speech at many universities have been held unconstitutional […] because they failed to protect the expression of potentially offensive ideas. This policy should be interpreted as narrowly as need be to preserve its constitutionality." *Id.* Plaintiff fails to mention section 13-204(e) in its preliminary-injunction motion or in its Complaint.

Plaintiff also inexplicably fails to mention section 13-204(b)(2), which expressly refutes any notion that the University's verbal harassment Rule could be applied to prohibit anonymous Students A, B and C's desired speech. It states: "To make an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea is not verbal harassment, *even if some listeners are offended by the argument or idea*." *Id.* (emphasis added). Read fairly and in its entirety, the University's verbal harassment Rule presents no threat to the political or ideological speech contemplated by Students A, B and C.

**2. The Acceptable Use Policy**

Plaintiff also complains that the University's Acceptable Use Policy, which addresses the use of IT resources, threatens free speech. Plaintiff points to section 5.6 of the Policy, which encourages students to "[b]e civil" and not to send "rude or harassing correspondence." Mot. 4. Plaintiff also points to the Policy's statement that "[i]f someone asks you to stop communicating with him or her, you should. If you fail to do so, the person can file a complaint and you could be disciplined." *Id.* According to Plaintiff, these provisions, standing alone, unconstitutionally chill free speech.

Again, however, Plaintiff has failed to read the entire Acceptable Use Policy, omitting key provisions that refute the illusory "fears" of Students A, B and C. For example, section 3.3 of the Policy, entitled "What are my First Amendment rights," confirms that: "[a]s an academic institution, we place great value on freedom of thought and expression. … [T]he university community encompasses a wide array of opinions, views, approaches, and temperaments … *We do not punish or prevent expression that may be offensive but that violates no specific law or university regulation.*" Ex. B-2 (emphasis added). In section 7.2.1, entitled "First Amendment Rights," the Policy states, "[i]n general, expressions of opinion by members of the university community that do not otherwise violate state and federal laws or university rules are protected as 'free speech.' This is true even though the opinions expressed may be unpopular or offensive to some." *Id.* Finally, in section 7.2.3, the Policy further confirms that disagreements between people, even heated arguments, are not violations unless they are threatening or otherwise unlawful. *Id.* These provisions make plain that: (1) the University encourages civility but does not punish mere incivility; (2) freedom of expression is expressly protected even when it offends some students; and (3) only conduct rising to a violation of law or the University's Institutional Rules can result in discipline.

**3. The Residence Hall Manual**

Plaintiff's complaint concerning the University's Residence Hall Manual appears to be its statement that students are expected to behave in a civil manner toward each other, and its affirmation that the

University is committed to maintaining an educational environment free from harassment and intimidation. *See* Mot. 3-4. But Plaintiff fails to acknowledge that the Manual makes clear that while civility is expected and encouraged, disciplinary action is tied only to violations of the Institutional Rules: "Residents who are suspected to have engaged in harassment as defined in the Institutional Rules will be referred to the Dean of Students for possible disciplinary action." ECF 8-2, p. 61 *see also* ECF 8-2, p. 6 (section 13-204(d) of the Institutional Rules confirms that "civility" is a "community norm[]" that "cannot be enforced by disciplinary rules").

Plaintiff also ignores the Manual's express protection of free speech, including speech that some might find offensive: "Students are free to communicate their ideas vigorously; those who are opposed to such ideas, whether in the classroom, the grounds of campus, or the residence halls, should tolerate the expression even of views that they find offensive or unacceptable." ECF 8-2, p. 80. The Manual further states, "[s]tudents who passionately disagree about important matters should be able to confront one another civilly … The best response to offensive speech is more free speech." *Id.* Thus, the Manual, read in its entirety, makes clear that Students A, B and C's self-censorship is untethered to University policy.

**4. The Campus Climate Response Team**

Finally, Plaintiff maintains that the University's Campus Climate Response Team (CCRT) also operates to unconstitutionally chill free speech. But Plaintiff mischaracterizes the CCRT as an investigative body with disciplinary authority, and likewise incorrectly alleges that the CCRT investigates and punishes students based on reports of "bias incidents" or "campus climate" incidents. *See* Mot. 4-5.

First, Plaintiff simply ignores substantial information on the actual function of the CCRT available on the University's website. There, the University expressly states that, "[a]s a non-adjudicating body, CCRT's main function is to support reporters of bias incidents and to provide information regarding university resources." ECF 8-2, p. 174. Individuals may report what they believe to be bias incidents to the CCRT. The CCRT supports such individuals by referring them to other University resources, and it gathers

information on trends for the University's strategic planning. As the CCRT webpage makes clear, it does not "investigate" or "adjudicate" anything. *See* ECF 8-2, pp. 128, (webpage describes precise types of actions that the CCRT can take in response to a report, none of which are investigative or adjudicative). Edna Dominguez, a CCRT member, confirms the website's information. *See* Ex. E, ¶ 4 ("The CCRT has no disciplinary authority; it is not an adjudicatory body; and it does not conduct (and has no authority to conduct) investigations into alleged student misconduct."). It is therefore unsurprising that Plaintiff fails to cite even a single instance in which any student has been investigated, much less disciplined, by the CCRT. As Ms. Dominguez confirms, "no student at the University has been investigated or punished by the CCRT for engaging in speech or expression protected by the First Amendment." Ex. E, ¶ 7.

Further, on the "Resources" page of the website, the University makes clear that the CCRT does not investigate or punish those who engage in speech some may deem hurtful or offensive. To the contrary, reiterating the First Amendment's protection of such speech, the University urges students to recognize that the best response to speech they deem offensive is more speech: "Exercise your rights! The best response to insensitive, offensive or demeaning speech is often more speech. The First Amendment to the United States Constitution protects speech, no matter how offensive its content." Ex. E-1.

In sum, Speech First omits key language on the CCRT webpage explaining that: (1) the CCRT's limited, non-adjudicatory role is to support reporters of bias incidents and to provide information regarding University resources; (2) the CCRT may undertake only limited actions in response to a bias report, none of which are investigative or adjudicative in nature; and (3) the CCRT's and the University's message to students is that the best response to offensive speech is more speech.

**5. The University's Enforcement of Its Speech Policy**

The University's enforcement of its speech policy further confirms that Plaintiff's free speech "fears" are completely groundless and unreasonable, depriving it of standing for yet another reason. Dr. Soncia Reagins-Lilly, the Dean of Students and chief disciplinarian of students at the University, confirms

that the University has not sanctioned any student for the content of their speech, and her office "interprets and enforces the Institutional Rules in a manner that protects student speech rights." Ex.B, ¶¶ 4-5.

Plaintiff has not cited a single instance in which a student has faced discipline based on the expression of controversial views. Indeed, ironically, Plaintiff's Complaint references several campus events involving debate on controversial issues that demonstrate the University's commitment to protecting, rather than suppressing, free speech. ECF 1, ¶¶ 87, 93 (referencing an event held by the Young Conservatives of Texas (YCT) and an event featuring conservative commentator Charlie Kirk). As recounted in the declarations of Dr. Andel Fils-Aime, Susan Buckenmeyer, J.B. Bird, and Captain Charles Bonnet, these events show that the University (1) takes precautions so that student organizations, including conservative-leaning organizations, may safely exercise their free-speech rights throughout campus; (2) does not investigate or punish such organizations merely for exercising their free speech rights; and (3) students who attempt to disrupt such free speech events will be subject to discipline if they violate the Institutional Rules. Exs. D, ¶¶ 3–6; F, ¶¶ 2–9; C, ¶¶ 3–9; G, ¶¶ 2–3; ECF 8-2, p. 16 (section 13-1102(a)); Ex. C-2 (University VP's statement that "all student organizations and individual students have a right to express their opinions on campus").

Finally, Plaintiff references an "affirmative action bake sale" held by YCT, which Plaintiff notes resulted in a student petition asking that YCT be disbanded. ECF 1, ¶ 93. Plaintiff fails to mention, however, that after the event, the University made clear its official view that it "does not and will not take any punitive action against an organization or its members for exercising their constitutional right to free speech," and that the University would instead "continue to protect students and student organizations in the exercise of their free speech rights." Ex. C, ¶ 5 (Bird). And the referenced resolution to disband YCT was overwhelmingly rejected by student government. Ex. C, ¶ 6 (Bird); *see also* Exs. H, ¶ 2, H-1(Helgren).

In sum, Plaintiff has failed to show that there is any credible threat that the University will enforce its harassment policy against the speech contemplated by Students A, B and C. The "fear" of such action is both completely subjective and illusory. For this reason also, Plaintiff lacks standing.

**B. The Policies at Issue Are Not Overbroad or Vague**

Issues of standing aside, Plaintiff's constitutional claim has no likelihood of success. To succeed on an overbreadth challenge, "the overbreadth of [the University's policies] must not only be real, but substantial as well, judged in relation to [their] plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Striking down a policy as overbroad is "strong medicine" that should be used "sparingly and only as a last resort." *Id.* at 613. Further, as the cases cited by Plaintiff recognize, before declaring a policy unconstitutional for overbreadth, the Court must first determine whether it is susceptible to a reasonable limiting construction. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215-16 (3d Cir. 2001).

Plaintiff has not met its burden of showing that it is likely to succeed in showing that the "last resort," "strong medicine" remedy of overbreadth somehow applies to the University's harassment policy. The "plainly legitimate sweep" of the policy is considerable. As the U.S. Department of Justice affirmed in another case recently brought by Plaintiff against the University of Michigan, "State-run colleges and universities can—and in certain circumstances, *must*—proscribe 'harassment,' 'bullying,' and 'bias-related misconduct . . . .'" U.S. Statement of Interest at 12–13, *Speech First, Inc. v. Schlissel, et al.*, No. 2:18-cv-11451-LVP-EAS (E.D. Mich. June 11, 2018), ECF 14 (emphasis in original). As described herein and in the evidence submitted with this response, the University's policy does just that, and nothing more. *See supra* part I.A.1-5. The University's harassment prohibition tracks the *Davis* standard articulated by the Supreme Court. Most importantly, the University's policies, as written, construed, and enforced, make clear that the mere expression of controversial or offensive speech, even in heated disagreement, is not harassment. *See supra* part I.A.1-5. Plaintiff arrives at a different conclusion only by failing to read the University's policies in their entirety and by misrepresenting the University's record of enforcement. Finally, Plaintiff does not

even address the issue of whether a reasonable limiting construction applies to the University's challenged policies. For this additional reason, Plaintiff's overbreadth challenge is likely to fail, not succeed.

Plaintiff's vagueness claim is equally meritless. A policy is not void for vagueness if it "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Constitution, however, neither imposes "impossible standards of clarity," *Kolender v. Lawson*, 461 U.S. 352, 361 (1983), nor requires "mathematical certainty" from statutory language. *Grayned*, 408 U.S. at 110. Instead, if it is "clear what the [policy] as a whole prohibits," it will not be declared unconstitutionally vague. *Grayned*, 408 U.S. at 110.

As with their overbreadth challenge, Plaintiff's vagueness assertions turn entirely on offering the Court only selected portions of the University's policies. Plaintiff fails to even acknowledge numerous provisions that protect the very types of speech contemplated by Students A, B and C. *See supra* part I.A.1-5. Moreover, the University's record of enforcement demonstrates consistency in its construction of its policies to protect the freedom of expression of all students, including those expressing ideas that may be viewed as controversial or offensive by other students. *See supra* part I.A.1-5. For these reasons, Plaintiff's facial challenge is unlikely to succeed on the merits, and its preliminary-injunction motion should be denied.

## II. ADDITIONAL FACTORS WEIGH AGAINST A PRELIMINARY INJUNCTION

Plaintiff devotes a single, conclusory sentence to the remaining requirements for a preliminary injunction, which require consideration of harm, balancing of equities, and the public interest. *See* Mot. 10. Plaintiff cannot meet any of these remaining requirements. There is no credible threat of harm to Plaintiff's members or other students, much less irreparable harm, and enjoining the University's harassment policy would substantially undermine the University's educational mission, which would harm the campus community and disserve the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiff's preliminary-injunction motion should be denied.

Dated: January 28, 2019

Respectfully submitted,

By: */s/ Charles L. Babcock*

Charles L. Babcock
State Bar No. 01479500
Joel R. Glover
State Bar No. 24087593
JACKSON WALKER L.L.P.
1401 McKinney Street, Suite 1900
Houston, Texas 77010
[Tel.] (713) 752-4200
[Fax] (713) 752-4221
*cbabcock@jw.com*
*jglover@jw.com*

Sean D. Jordan
State Bar No. 00790988
Adam W. Aston
State Bar No. 24045423
JACKSON WALKER L.L.P.
100 Congress Ave., Suite 1100
Austin, Texas 78701
[Tel.] (512) 236-2000
[Fax] (512) 236-2002
*sjordan@jw.com*
*aaston@jw.com*

**COUNSEL FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

This is to certify that on January 28, 2019, a copy of the foregoing was electronically filed with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record listed below. Video exhibits C-1, D-3, G-1, G-2, G-3, and I-1, as well as exhibits D-1 and D-2, which were filed under sealed pursuant to the Unopposed Protective Order entered by the Court on January 24, 2019 (Doc. 19), were transmitted to counsel of record via email and Federal Express overnight at the following addresses:

William S. Consovoy
Jeffrey M. Harris
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
*will@consovoymccarthy.com*
*jeff@consovoymccarthy.com*
*mike@consovoymccarthy.com*
*cam@consovoymccarthy.com*

COUNSEL FOR PLAINTIFF SPEECH FIRST, INC.

*/s/ Charles L. Babcock*
Charles L. Babcock