IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

19 JUN -4  PM 2: 57

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
            DEPUTY CLERK

| | | |
|---|---|---|
| SPEECH FIRST, INC., | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. 1:18-CV-1078-LY |
| | § | |
| GREGORY L. FENVES, | § | |
| DEFENDANT. | § | |

## MEMORANDUM OPINION AND ORDER ON
## MOTION FOR PRELIMINARY INJUNCTION

Before the court in the above-styled and numbered cause are Plaintiff's Motion for Preliminary Injunction filed December 21, 2018 (Dkt. No. 8), Defendant Gregory L. Fenves' Response to Plaintiff's Motion for Preliminary Injunction filed January 28, 2019 (Dkt. No. 20), Plaintiff's Reply in Support of its Motion for Preliminary Injunction filed February 4, 2019 (Dkt. No. 25), Defendant Gregory L. Fenves' Objection to the Declaration of Nicole Neily Submitted by Plaintiff in Support of its Motion for Preliminary Injunction filed January 28, 2019 (Dkt. No. 22), Plaintiff's Response to, or in the Alternative Motion to Strike, Defendant's Objections to the Declaration of Nicole Neily filed February 4, 2019 (Dkt. No. 26), Defendant Gregory L. Fenves' Response to Plaintiff's Alternative Motion to Strike Defendant's Objections to the Declarations of Nicole Neily filed February 11, 2019 (Dkt. No. 27), and Plaintiff's Reply in Support of its Alternative Motion to Strike Defendant's Objections to the Declarations of Nicole Neily filed February 18, 2019 (Dkt. No. 28). On March 1, 2019, the court held a hearing on the motions at which all parties were represented by counsel. Having considered the motions, responses, replies, exhibits, applicable law, and the arguments of counsel, the court will deny the motion for the reasons to follow.

## I.   BACKGROUND

The University of Texas at Austin ("the University") has adopted a number of different policies concerning speech on its campus, some of which are housed in its Institutional Rules, the Residence Hall Manual, and an Acceptable Use Policy.   In doing so, the University endeavors to strike a difficult balance between robust protections for its students' First Amendment rights and ensuring a learning environment free from discriminatory and harassing speech or conduct.   Plaintiff Speech First, Inc., ("Speech First") is an organization that seeks to preserve the First Amendment rights of college students around the country.   Speech First, presumably as part of its mission to preserve students' First Amendment rights, has solicited students in a rather unsavory manner. On its website, it advertised "for $5, this free-speech group will help you sue your university for censorship" by "[t]aking aim at schools 'with a huge endowment and an army of lawyers.'"   It worked.   Speech First filed this suit on behalf of three anonymous students at the University—Students A, B, and C—who wish to express unpopular viewpoints about pressing issues of the day, such as illegal immigration, affirmative action, the nuclear family, and the #MeToo Movement.   Speech First contends that expressing these unpopular views could be deemed "offensive," "harassing," "uncivil," or "rude" under the University's policies, "thus risking investigation and formal or informal punishment" by the University.   Speech First also says that expressing unpopular views "could result in an accusation of a 'bias incident' or 'campus climate incident,' triggering an investigation by the Campus Climate Response Team and potential formal or informal punishment."   Speech First argues that these University policies chill its members' speech and facially challenges these policies under the First Amendment as overbroad and vague.

Speech First seeks a preliminary injunction to enjoin the University from (1) taking any action to investigate, threaten, or punish students for violations of the prohibitions on "verbal harassment," "incivility," "harassment," "intimidation," or "rudeness" found in the Institutional Rules, the Residence Hall Manual, and the Acceptable Use Policy; and (2) using the Campus Climate Response Team to investigate, log, threaten, or punish students for "bias incidents" or "campus climate incidents."

The University counters that Speech First lacks standing to sue because the anonymous students do not face any credible threat of disciplinary action.  First, the University maintains that the type of speech at issue here is not prohibited by its policies.  Second, the University argues that the students self-censorship is unfounded and their apprehension of disciplinary action illusory.  Finally, the University argues that even if Speech First has standing, Speech First does not meet its burden in showing that it is likely to succeed on the merits.

### A.  The Institutional Rules (" the Rules")

Chapter 13 of the Rules governs all speech, expression, and assembly that takes place on campus, and students who violate the Rules may be subject to disciplinary action by the University.  The chapter begins by broadly pronouncing: "[t]he freedoms of speech, expression, and assembly are fundamental rights of all persons and are central to the mission of the University."  With this mission in mind, the Rules prohibit "any statement that constitutes verbal harassment of any other person."  Verbal harassment is defined as hostile or offensive speech, oral, written, or symbolic, that:

> (A) is not necessary to the expression of any idea described in subsection 13–204(b)(2);
> (B) is sufficiently severe, pervasive, or persistent to create an objectively hostile environment that interferes with or diminishes the victim's ability to participate in or benefit from the services, activities, or privileges provided by the University;

3

(C) and personally describes or is personally directed to one or more specific individuals.

The prohibition on verbal harassment provides a very important caveat. Verbal harassment does not include "an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea is not verbal harassment, even if some listeners are offended by the argument or idea." The Rules also provide several examples: "verbal harassment may consist of threats, insults, epithets, ridicule, personal attacks" and may be based on "the victim's appearance, personal characteristics, or group membership, including but not limited to race, color, religion, national origin, gender, age, disability, citizenship, veteran status, sexual orientation, gender identity or gender expression, ideology, political views, or political affiliation." Finally, the Rules specify that the prohibition on verbal harassment "does not exhaust the category of speech that is unnecessary and inappropriate to vigorous debate in a diverse community of educated people," but that such categories are "community norms," which "cannot be enforced by disciplinary rules."

### B. The Acceptable Use Policy

The University maintains Internet technology resources, including computer devices, applications, email addresses, and Internet access. The Acceptable Use Policy ("the Policy") governs how students must use these services, and all students using these services must agree to comply with the Policy. Should a student violate the Policy, the student may receive verbal warning, revocation of access privileges, disciplinary probation, suspension from the university, and criminal prosecution. The Policy encourages students to "be civil" and not send "rude or harassing correspondence." The Policy reasonably advises that "if someone asks you to stop communicating with him or her, you should. If you fail to do so, the person can file a complaint and you can be disciplined."

4

The Policy also contains several limitations on its request for civility. For example, in a section entitled "What are my First Amendment rights," the University makes clear that it "place[s] great value on freedom of thought and expression." Because "[t]he University community encompasses a wide array of opinions, views, approaches, and temperaments . . . [w]e do not punish or prevent expression that may be offensive but that violates no specific law or university regulation." The Policy also puts students on notice of their free speech rights:

> In general, expressions of opinion by members of the University community that do not otherwise violate state and federal laws or university rules are protected as 'free speech.' This is true even though the opinions expressed may be unpopular or offensive to some. . . . We encourage all those associated with the University to exercise their constitutional rights and freedoms responsibly. We do not, however, punish people who express views that may be unpopular or offensive, but who break no laws or University rules while doing so.

The Policy finally states that "[d]isagreements between people, even heated arguments, unless threatening or otherwise unlawful, are not considered violations . . . . [The University] does, however, strongly encourage all its users to be polite and courteous."

### C. The Residence Hall Manual ("the Manual")

The Manual contains two policies governing "harassment" and "incivility." First, it states that "[m]embers of an educational community should adhere to standards of civility and good taste that reflect mutual respect." It also makes clear that "[i]t is the policy of the University to maintain an educational environment free from harassment and intimidation." As part of "an effort to foster an environment free from harassment and intimidation," the University explains that "Residence Life is committed to responding appropriately to acts of racism, sexism, heterosexism, cissexism, ageism, ableism, and any other force that seeks to suppress another individual or group of individuals." If such acts occur in a residence hall, "the Residence Life staff, in conjunction with the Residence Hall Council, may lead a floor or hall meeting to discuss the incident and decide, as a community, appropriate steps that need to be

taken to address the incident." The Manual further warns that "residents who are suspected to have engaged in harassment as defined in the Institutional Rules will be referred to the Dean of Students for possible disciplinary action."

Second, The Manual provides that "[s]tudents are expected to behave in a civil manner that is respectful of their community and does not disrupt academic or residential activity. Uncivil behaviors and language that interfere with the privacy, health, welfare, individuality, or safety of other persons are not permitted." At the same time, the Manual makes clear that "[s]tudents are free to communicate their ideas vigorously; those who are opposed to such ideas, whether in the classroom, the grounds of campus, or the residence halls, should tolerate the expression even of views that they find offensive or unacceptable." Indeed, "[s]tudents who passionately disagree about important matters should be able to confront one another civilly . . . The best response to offensive speech is more free speech."

The Manual puts residents on notice "to abide by all city, state, and federal laws/statutes, all regulations of the University and University of Texas System, as well as all specific Housing policies articulated in the Residence Hall Manual." It admonishes students that "[f]ailure to abide by such laws and rules subjects the student to possible disciplinary action by the University and/or criminal prosecution if warranted."[1]

---

[1] The Manual sets forth a hierarchy of punishment for rule violations, depending on the seriousness of the violation: "[i]n the context of suspected rule violations occurring in campus residence halls, alleged misconduct will be documented and referred to the Complex Coordinator of that area. Depending on the nature of the allegation and the totality of the circumstances, the Complex Coordinator may refer the allegation to the Dean of Students for resolution or adjudicate the matter through the residence hall conduct process." "Other consequences may include reprimands, educational sanctions, room changes, removal from University Housing and University discipline."

### D.  The Campus Climate Response Team

The Campus Climate Response Team serves as a University-wide team that develops and facilitates the implementation of appropriate responses to perceived bias incidents impacting the University community.  Students or faculty may report what they perceive to be a "bias incident" to the Team online, in person, or by phone.  The Team maintains an online log of all reported bias incidents.  Once a report is made, the core functions of the Team include: gathering information and managing a reported incident; supporting individuals involved in an incident; providing appropriate and effective education; identifying and connecting with appropriate support services; evaluating the response process; and coordinating, when appropriate, activities with other campus-wide entities, especially those involved with crisis management.  The website for the Team makes clear that it is a "non-adjudicating body" that "support[s] reporters of bias incidents and to provide[s] information regarding university resources."    The Team also addresses potential gaps in University policies and procedures that may impede the University's ability to minimize bias incidents, in the hopes of creating a more welcoming and inclusive environment.

### II.    APPLICABLE LAW

### A.  Preliminary Injunction

In order to obtain a preliminary injunction, Speech First must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest.  *Moore v. Brown*, 868 F.3d 398, 402–03 (5th Cir. 2017) (per curiam).

**B. Standing**

Judicial power may be invoked to adjudicate a disagreement between litigants only if the party bringing suit has standing to bring its claims. Article III of the Constitution limits the exercise of judicial power to the "resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). Standing to bring suit is an "essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016), in order to ensure that judicial power is invoked only to "redress or prevent actual or imminently threatened injury" particular to the plaintiff. *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

The elements of standing are familiar: a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 560–61. The plaintiff bears the burden of establishing each of these elements "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. "Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,' the plaintiff[] must make a 'clear showing' that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), *cert. denied*, 138 S. Ct. 652 (2018), and *cert. denied sub nom. Campaign for S. Equal. v. Bryant*, 138 S. Ct. 671 (2018); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of

persuasion.") (emphasis added). The court may not "create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990). "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), and "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Where a plaintiff does not present evidence sufficient to meet its standing burden, the court lacks subject-matter jurisdiction, and the court must dismiss the case. Fed. R. Civ. P. 12(h)(3).

Though the requirements of standing are somewhat "relaxed in the First-Amendment context," standing is relaxed "only as relating to the various court-imposed prudential requirements of standing." *Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018). Even in the First-Amendment context, plaintiffs "still must show that they satisfy the core Article III requirements of injury, causation, and redressability." *Id.* Here, two theories of standing are relevant: individual and associational standing.

Because Speech First is suing on behalf of its members, it must show that it has associational standing. An association seeking to "bring suit on behalf of its members" has standing only if "its members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Speech First must additionally demonstrate that "the interests it seeks to protect are germane to the organization's purpose" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*

There are two ways in which an individual may establish an ongoing injury when seeking to facially enjoin a policy alleged to violate her First Amendment rights: a credible threat of prosecution or self-censorship that is objectively reasonable. *See Seals*, 898 F.3d at 593 n.13

(distinguishing between credible threat of prosecution and self-censorship theories of standing). Under a credible-threat-of-prosecution theory, "a plaintiff must produce evidence of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 391 (5th Cir. 2018) (citing *Nat'l Fed'n of the Blind of Tex. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011)), *cert. denied*, 139 S. Ct. 639 (2018). A plaintiff must also establish a "credible threat of prosecution." *Id.* (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Under a self-censorship theory, a plaintiff may argue her future speech is chilled by a policy, though not prohibited by it. If a plaintiff claims to have self-censored due to a fear of punishment, the self-censorship must be objectively reasonable and arise from a fear of punishment that is not "imaginary or wholly speculative." *Zimmerman*, 881 F.3d at 390; *Babbitt*, 442 U.S. at 302. Thus, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

As a preliminary matter, this court addresses Speech First's incomplete formulation of standing in the First-Amendment context. Speech First contends that no history of past enforcement of a policy is required to allege standing; instead, it argues that the mere existence of an allegedly vague or overbroad statute is an injury in itself. *See Ctr. for Individ. Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006). By invoking this passage from *Carmouche*, Speech First asks this court to hold that the mere invocation of the First Amendment will suffice for standing purposes.

Contrary to Speech First's arguments, the "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury." *See Google, Inc.*

10

*v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016) (finding enforcement not sufficiently immediate to warrant injunction; remanding with instructions to dismiss). *Carmouche* itself recognizes that more is required than an allegedly vague or overbroad statute—the court held that a plaintiff's "self-censorship must arise from a fear of prosecution that is not imaginary or wholly speculative." *Carmouche*, 449 F.3d at 660. And, as the Fifth Circuit recently affirmed, there remains a "core requirement that to bring a preenforcement challenge, a plaintiff must 'produce evidence of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute,' as well as a 'credible threat of prosecution.'" *Zimmerman*, 881 F.3d at 388 (citing *Nat'l Fed'n of the Blind of Tex.*, 647 F.3d at 209; *Babbitt*, 442 U.S. at 298; *Susan B. Anthony List*, 573 U.S. at 163–64); *see also Seals*, 898 F.3d at 592–93 n.13 (characterizing *Carmouche* as "holding that the *real chilling* of intended speech, brought about by a *real threat* of future prosecution, is enough to establish Article III standing") (emphasis added). A careful review of Supreme Court and Fifth Circuit standing jurisprudence in the First-Amendment context confirms what the Fourth Circuit recently observed: that "a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018), *cert. denied*, — S. Ct.—, No. 18-704, 2019 WL 1005925 (Mar. 4, 2019). Although Speech First is correct that proof of past-enforcement of the University policies is not an absolute requirement for standing, Speech First must still allege a *credible* threat of enforcement of the University policies.

11

### III.   ANALYSIS

In order to prove an injury sufficient to claim a credible threat of enforcement, Speech First must produce evidence clearly showing that its members "inten[d] to engage in a course of conduct" that is constitutionally protected and proscribed by University policies. *Zimmerman*, 881 F.3d at 391.[2]   Speech First could also present evidence clearly showing that its students' self-censorship is objectively reasonable because their fear of punishment is not "imaginary or wholly speculative." *Id.* at 390; *Babbit*, 442 U.S. at 302.   For the reasons stated below, the court finds that Speech First fails to present sufficient evidence that its members intend to engage in speech proscribed by the language of the challenged University policies. *See Zimmerman*, 881 F.3d at 390; *Nat'l Fed'n of the Blind of Tex.*, 647 F.3d at 209; *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545–47 (5th Cir. 2008).   Nor does Speech First present sufficient evidence that its members' self-censorship is objectively reasonable based on a credible threat of punishment under the University policies.

Speech First alleges that three anonymous student members wish to discuss and debate controversial topics on campus, including illegal immigration, affirmative action, the Second Amendment, the #MeToo Movement, support for President Trump, support for Israel, and support for the confirmation of Justice Kavanaugh to the United States Supreme Court.   For example, the complaint alleges that Anonymous Student A "supports Israel, believes in a race-blind society, supports President Trump, is pro-life, and supports the border wall."   Anonymous Student B "strongly supports the Second Amendment right to keep and bear arms, believes in a race-blind society, and has serious concerns that the 'Me Too' movement will erode due process."   Student B also believes that "affirmative action should be prohibited and that Justice

---

[2]   The University does not dispute that the speech of the student members is entitled to the protections of the First Amendment.

Kavanaugh was innocent of the accusations made against him and was properly confirmed to the U.S. Supreme Court." Anonymous Student C, who lives in the University housing, "believes that the breakdown of the nuclear family has had many negative effects on society, he is strongly pro-life, he strongly supports the Second Amendment, and he believes that Justice Kavanaugh was treated unfairly during his confirmation proceedings." Speech First provides no supporting affidavits from Students A, B, or C about any specific statements they wish to make.[3]

Instead, Speech First presents a generalized affidavit by the president of Speech First, Nicole Neily, stating that student members seek to discuss controversial topics but are prevented from doing so.[4] The declaration states that Neily is "personally familiar with several of Speech First's members at the University." She further declares that Speech First's members "hold a wide array of different views and opinions on matters such as politics, race, religion, gender identity, abortion, gun rights, immigration, foreign affairs, and countless other sensitive and controversial topics." She attests that student members "want to be able to have open and robust intellectual debates and discussions about these issues in their dormitories, on campus, online, and in the City of Austin." She claims that student members are "afraid to voice their views out of fear that their speech" may violate University policies.

---

[3] In fact, the anonymous students are neither identified in the pleadings, nor in any other documents submitted to this court. The only information known about Students A, B, and C, is that summarized above.

[4] The University objects to evidence contained within Neily's declaration as hearsay, lacking foundation, and calling for speculation. These objections are unfounded, because this court may consider otherwise inadmissible evidence at the preliminary-injunction stage. *See Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir.1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence."). The University's objections are therefore overruled.

Based solely on the generalized allegations and declarations of the speech in which Students A, B, and C generally wish to engage, Speech First asks this court to conclude that Students A, B, and C face a credible threat that the speech in which they seek to engage would be considered "harassment," "uncivil," "rude," or "offensive" under the Institutional Rules, the Residence Hall Manual, or the Acceptable Use Policy.

Based on the same factual allegations, Speech First also alleges that Students A, B, and C face a credible threat that their speech would be reported as a bias incident and would lead to an investigation and formal or informal punishment by the Campus Climate Response Team. Speech First mentions in its complaint several conservative events on campus that triggered reports by University students to the Team. These events, Speech First contends, reinforce "that certain viewpoints are not welcome on campus and will be met with retribution from the University and other students." Speech First also posits that the Team received 100 reports of bias incidents in the 2017 to 2018 school year and more than 1000 reports of bias since 2012.

"Standing is not created by a declaration in court pleadings," *Miss. State Democratic Party*, 529 F.3d at 545–46, and Speech First offers no more than generalized declarations of broad categories of speech in which Students A, B, and C wish to engage. The topics that the students wish to discuss—affirmative action, the #MeToo Movement, President Trump, immigration, Justice Kavanaugh, and the Second Amendment—are not prohibited by the language of the Institutional Rules, the Residence Hall Manual, or the Acceptable Use Policy. The complete dearth of specific evidence of the speech in which the students wish to engage is especially problematic at this juncture. Without such evidence, this court cannot determine whether Students A, B, and C have an intention to engage in speech that is prohibited or

arguably covered by the challenged policies. *Cf. Zimmerman*, 881 F.3d at 390; *Nat'l Fed'n of the Blind of Tex.*, 647 F.3d at 209; *Miss. State Democratic Party*, 529 F.3d at 545–47.

Likewise, Speech First proffers no evidence that the University has punished students for violating the Institutional Rules, the Residence Hall Manual, or the Acceptable Use Policy. To the contrary, the University presents substantial evidence that no such history of punishment exists. For example, Dr. Soncia Reagins-Lilly, the Dean of Students and administrator in charge student discipline at the University, confirms by affidavit that the University has not sanctioned any students for the content of their speech. Dr. Reagins-Lilly also confirms that although the University desires civility on campus, the rules make clear that aspirations of civility are community norms that cannot be enforced by disciplinary rules. The University also presents evidence that "no student at the University has been investigated or punished by the Campus Climate Response Team for engaging in speech or expression protected by the First Amendment." And the record also makes clear that the Campus Climate Response Team does not engage in investigations or punishment of any sort.

In sum, Speech First presents no evidence that any University students—much less any of Speech First's student members—have been disciplined, sanctioned, or investigated for their speech. And without any evidence of a credible threat of enforcement of the challenged policies—much less the "clear showing" required to support standing at the preliminary-injunction stage—this court concludes that the students' self-censorship is not based on a well-founded threat of punishment under the University policies that is not "imaginary or wholly speculative." *Barber*, 860 F.3d at 352. Because Speech First's student members have not made a clear showing that they "have standing to sue in their own right," Speech First likewise does

not have standing to sue. *Hunt*, 432 U.S. at 343. As such, this court lacks the subject-matter jurisdiction and must dismiss. Fed. R. Civ. P. 12(h)(3).

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Preliminary Injunction filed December 21, 2018 (Dkt. No. 8) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Gregory L. Fenves' Objection to the Declaration of Nicole Neily Submitted by Plaintiff in Support of its Motion for Preliminary Injunction filed January 28, 2019 (Dkt. No. 22) is **OVERRULED**.   Accordingly, Plaintiff's Response to, or in the Alternative Motion to Strike, Defendant's Objections to the Declaration of Nicole Neily filed February 4, 2019 (Dkt. No. 26) is **DISMISSED**.

**IT IS FURTHER ORDERED** that Speech First Inc.'s claims against Gregory L. Fenves are **DISMISSED** without prejudice for lack of standing.

SIGNED this _____4th_____ day of June, 2019.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE